# 23-15

## 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔠𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰 𝔣𝔬𝔯 𝔱𝔥𝔢 𝔖𝔢𝔠𝔬𝔫𝔡 𝔠𝔦𝔯𝔠𝔲𝔦𝔱

Do No Harm,

*Plaintiff-Appellant,*

v.

Pfizer Inc.,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Southern District of New York, No. 1:22-cv-7908

———————————

## OPENING BRIEF OF PLAINTIFF-APPELLANT DO NO HARM

———————————

Thomas R. McCarthy
Cameron T. Norris
Frank H. Chang
C'Zar Bernstein
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Ste. 700
Arlington, VA 22201
(703) 243-9423
tom@consovoymccarthy.com
cam@consovoymccarthy.com
frank@consovoymccarthy.com
czar@consovoymccarthy.com

*Counsel for Plaintiff-Appellant*

## CORPORATE DISCLOSURE STATEMENT

Plaintiff-Appellant, Do No Harm, is a non-profit corporation. It has no parent

corporation, and no publicly held corporation owns 10% or more of its stock.

## STATEMENT WITH RESPECT TO ORAL ARGUMENT

Do No Harm requests oral argument.

# TABLE OF CONTENTS

Corporate Disclosure Statement......................................................................i

Statement with Respect to Oral Argument.........................................................i

Table of Authorities...................................................................................iii

Introduction..............................................................................................1

Jurisdictional Statement...............................................................................2

Statement of the Issues................................................................................3

Statement of the Case..................................................................................3

    I.      Pfizer is barred from discriminating based on race.............................4

    II.     Pfizer's Breakthrough Fellowship excludes whites and Asians......................5

    III.   Do No Harm's white and Asian members cannot apply to Pfizer's fellowship on an equal footing. .........................................................7

    IV.   The district court sua sponte dismisses Do No Harm's lawsuit. ...................9

Summary of Argument................................................................................15

Standard of Review...................................................................................17

Argument...............................................................................................17

    I.      This Court should vacate the dismissal of Do No Harm's claims under Title VI and the ACA because the district court erred by sua sponte dismissing the case. .............................................................17

    II.     This Court should reverse the dismissal of Do No Harm's claim under §1981 because the complaint plausibly alleges standing................................26

          A.     Do No Harm did not need to reveal its members' actual names in the complaint.................................................................26

          B.     Do No Harm sufficiently alleged that Members A and B are able and ready to apply..............................................................36

          C.     Associations like Do No Harm can sue on behalf of their members under §1981.........................................................42

    III.   This Court should reinstate Do No Harm's state and local claims..............48

Conclusion .............................................................................................48

Certificate of Compliance ...........................................................................49

Certificate of Service.................................................................................49

# TABLE OF AUTHORITIES

## Cases

*Absolute Activist Value Master Fund Ltd. v. Ficeto,*
677 F.3d 60 (2d Cir. 2012) ................................................................25

*Adarand Constr's, Inc. v. Peña,*
515 U.S. 200 (1995) ................................................................... 1, 38

*AFPF v. Bonta,*
141 S.Ct. 2373 (2021) ...............................................................33

*Aguayo v. Richardson,*
473 F.2d 1090 (2d Cir. 1973) ...........................................passim

*Ala. Legis. Black Caucus v. Alabama,*
575 U.S. 254 (2015) ................................................................46

*Alexander v. Sandoval,*
532 U.S. 275 (2001) ............................................................ 45, 46

*All. for Env't Renewal, Inc. v. Pyramid Crossgates Co.,*
436 F.3d 82 (2d Cir. 2006) .....................................................25

*Am. Coll. of Emergency Physicians v. Blue Cross & Blue Shield of Ga.,*
833 F. App'x 235 (11th Cir. 2020) ........................................28

*Am. Psychiatric Ass'n, Inc. v. Anthem Health Plans, Inc.,*
821 F.3d 352 (2d Cir. 2016) ..................................................10

*Ass'n Against Discrimination in Emp., Inc. v. City of Bridgeport,*
647 F.2d 256 (2d Cir. 1981) ..................................................22

*Assoc. Gen. Contractors of Am. v. Cal. Dep't of Transp.,*
713 F.3d 1187 (9th Cir. 2013) ..............................................28

*Bernier v. Trump,*
242 F. Supp. 3d 31 (D.D.C. 2017) ........................................23

*Brown v. Davenport,*
142 S.Ct. 1510 (2022) ...........................................................31

*Bldg. & Constr. Trades Council of Buffalo v. Downtown Dev., Inc,*
448 F.3d 138 (2d Cir. 2006) ......................................11, 27, 28

*Callum v. CVS Health Corp.,*
137 F. Supp. 3d 817 (D.S.C. 2015) .......................................24

*Carney v. Adams*,
    141 S.Ct. 493 (2020) ........................................................................ 11, 40, 41, 42

*Catzin v. Thank You & Good Luck Corp.*,
    899 F.3d 77 (2d Cir. 2018) ............................................................................. 18

*Cave v. E. Meadow Union Free Sch. Dist.*,
    514 F.3d 240 (2d Cir. 2008) .......................................................................... 19

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*,
    868 F.3d 104 (2d Cir. 2017) ..................................................................... 46, 47

*Chapman v. Houston Welfare Rts. Org.*,
    441 U.S. 600 (1979) ...................................................................................... 47

*Christian Lab. Ass'n v. City of Duluth*,
    2021 WL 2783732 (D. Minn. July 2) .......................................................... 38, 41

*City of Richmond v. J.A. Croson Co.*,
    488 U.S. 469 (1989) ........................................................................................ 1

*Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*,
    140 S.Ct. 1009 (2020) ................................................................................... 44

*Connecticut v. Am. Elec. Power Co.*,
    582 F.3d 309 (2d Cir. 2009) .......................................................................... 29

*Consol. Rail Corp. v. Darrone*,
    465 U.S. 624 (1984) ...................................................................................... 22

*Dep't of Com. v. New York*,
    139 S.Ct. 2551 (2019) ........................................................................ 31, 33, 35

*DHS v. Regents of the Univ. of Cal.*,
    140 S.Ct. 1891 (2020) ................................................................................... 31

*Disability Rts. Wis., Inc. v. Walworth Cnty. Bd. of Sup'rs*,
    522 F.3d 796 (7th Cir. 2008) ......................................................................... 29

*Do No Harm v. Pfizer Inc.*,
    2022 WL 17740157 (S.D.N.Y. Dec. 16) .......................................................... 4

*Doe One v. CVS Pharmacy, Inc.*,
    2022 WL 3139516 (N.D. Cal. Aug. 5) ............................................................ 23

*Drachman v. Boston Sci. Corp.*,
    258 F. Supp. 3d 207 (D. Mass. 2017) ............................................................ 23

*Draper v. Healey*,
    827 F.3d 1 (1st Cir. 2016) ........................................................................ 29, 30

*Erickson v. Pardus,*
   551 U.S. 89 (2007) ................................................. 30, 37

*FAIR, Inc. v. Rumsfeld,*
   291 F. Supp. 2d 269 (D.N.J. 2003) .......................... 32, 33

*FAIR, Inc. v. Rumsfeld,*
   390 F.3d 219 (3d Cir. 2004) ......................................... 32

*Fed. Defs. of N.Y., Inc. v. Fed. Bureau of Prisons,*
   954 F.3d 118 (2d Cir. 2020) ...................................... 35, 37

*Food & Water Watch, Inc. v. Vilsack,*
   808 F.3d 905 (D.C. Cir. 2015) ...................................... 20

*Fountain v. Karim,*
   838 F.3d 129 (2d Cir. 2016) ......................................... 48

*Ga. Republican Party v. SEC,*
   888 F.3d 1198 (11th Cir. 2018) ..................................... 28

*Gellman v. Maryland,*
   538 F.2d 603 (4th Cir. 1976) ........................................ 20

*Golden v. City of Columbus,*
   404 F.3d 950 (6th Cir. 2005) ........................................ 15

*Gratz v. Bollinger,*
   539 U.S. 244 (2003) .......................................... 1, 36, 38

*Hall v. City & Cnty. of San Francisco,*
   2017 WL 5569829 (N.D. Cal. Nov. 20) .......................... 37

*Hancock Cnty Bd. of Sup'rs v. Ruhr,*
   487 F. App'x 189 (5th Cir. 2012) .................................. 27

*Hassan v. Iowa,*
   2012 WL 12974068 (S.D. Iowa Apr. 26) ...................... 37, 41

*Hassan v. Iowa,*
   493 F. App'x 813 (8th Cir. 2012) .................................. 37

*Hu v. City of New York,*
   927 F.3d 81 (2d Cir. 2019) .................................. 23, 29, 41

*Hudson Valley Freedom Theater, Inc. v. Heimbach,*
   671 F.2d 702 (2d Cir. 1982) ........................................ 43

*Huertas v. E. River Hous. Corp.,*
   81 F.R.D. 641 (S.D.N.Y. 1979) ..................................... 47

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977) ..................................................................... 26, 47

*Int'l Bhd. of Teamsters v. United States*,
431 U.S. 324 (1977) ............................................................................. 36

*Int'l Code Council, Inc. v. UpCodes, Inc.*,
43 F.4th 46 (2d Cir. 2022) ......................................................... 17, 24, 25

*J.S. v. T'Kach*,
714 F.3d 99 (2d Cir. 2013) ................................................................... 17

*Jett v. Dallas Indep. Sch. Dist.*,
491 U.S. 701 (1989) ............................................................................. 45

*John v. Whole Foods Mkt. Grp., Inc.*,
858 F.3d 732 (2d Cir. 2017) ......................................................... passim

*Johnson v. Ry. Express Agency, Inc.*,
421 U.S. 454 (1975) ............................................................................. 44

*Jones v. Metro. Atlanta Rapid Transit Auth.*,
681 F.2d 1376  (11th Cir. 1982) ........................................................... 22

*Klocke v. Watson*,
936 F.3d 240 (5th Cir. 2019) ............................................................... 45

*Kluchnik v. Lehigh Valley Coal Co.*,
228 F. 880 (2d Cir. 1915) ................................................................... 45

*League of Women Voters of Nassau Cnty. v. Nassau Cnty. Bd. of Supervisors*,
737 F.2d 155 (2d Cir. 1984) ....................................................... 12, 45, 46

*Lewis v. New York*,
547 F.2d 4 (2d Cir. 1976) ................................................................... 19

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014) ............................................................................. 10

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ................................................................. 27, 28, 34

*McGinty v. New York*,
251 F.3d 84 (2d Cir. 2001) ............................................................. 18, 25

*NAACP v. Ala. ex rel. Patterson*,
357 U.S. 449 (1959) ............................................................................. 33

*NAACP v. Ameriquest Mortg. Co.*,
635 F. Supp. 2d 1096 (C.D. Cal. 2009) ............................................... 48

*NAACP v. Trump*,
    298 F. Supp. 3d 209 (D.D.C. 2018) ..................................................................31

*Nat'l Council of La Raza v. Cegavske*,
    800 F.3d 1032 (9th Cir. 2015) ................................................28, 30, 35

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*,
    508 U.S. 656 (1993) ........................................................36, 38, 46

*Negusie v. Holder*,
    555 U.S. 511 (2009) ..................................................................45

*New Hope Family Servs., Inc. v. Poole*,
    966 F.3d 145 (2d Cir. 2020) ........................................................20

*New York v. U.S. Dep't of Com.*,
    351 F. Supp. 3d 502 (S.D.N.Y. 2019) ................................31, 33, 35

*Nnebe v. Daus*,
    644 F.3d 147 (2d Cir. 2011) ........................................................43

*Olmsted v. Pruco Life Ins. Co. of N.J.*,
    283 F.3d 429 (2d Cir. 2002) ........................................................46

*Palin v. N.Y. Times Co.*,
    940 F.3d 804 (2d Cir. 2019) ........................................................24

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*,
    551 U.S. 701 (2007) ........................................................35, 38, 46

*Paulsen v. Remington Lodging & Hosp., LLC*,
    773 F.3d 462 (2d Cir. 2014) ........................................................21

*Perez v. Ortiz*,
    849 F.2d 793 (2d Cir. 1988) ................................18, 20, 21, 24

*Phelps v. Kapnolas*,
    308 F.3d 180 (2d Cir. 2002) ........................................................41

*Pietsch v. Bush*,
    755 F. Supp. 62 (E.D.N.Y. 1991) ................................................19

*Prairie Rivers Network v. Dynegy Midwest Generation, LLC*,
    2 F.4th 1002 (7th Cir. 2021) ................................................29, 30

*Publicola v. Lomenzo*,
    2022 WL 17256714 (2d Cir. Nov. 29)..........................................32

*Regents of Univ. of Cal. v. Bakke*,
    438 U.S. 265 (1978) ........................................................38, 39

*Revelis v. Napolitano*,
844 F. Supp. 2d 915 (N.D. Ill. 2012) ................................................... 37, 41

*Rojas v. Cigna Health & Life Ins. Co.*,
793 F.3d 253 (2d Cir. 2015) ...................................................................19

*Rowley v. City of N.Y.*,
2005 WL 2429514 (S.D.N.Y. Sept. 30) ..................................................21

*Rumsfeld v. FAIR, Inc.*,
547 U.S. 47 (2006) .................................................................................32

*Runyon v. McCrary*,
427 U.S. 160 (1976) ...............................................................................43

*S.C. State Conf. of NAACP v. Alexander*,
2022 WL 453533 (D.S.C. Feb. 14) ................................................... 28, 35

*Schlesinger Inv. P'Ship v. Fluor Corp.*,
671 F.2d 739 (2d Cir. 1982) ............................................................. 18, 24

*Sealed Plaintiff v. Sealed Defendant #1*,
537 F.3d 185 (2d Cir. 2008) ...................................................................32

*See DiFolco v. MSNBC Cable, LLC*,
622 F.3d 104 (2d Cir. 2010) ...................................................................23

*SFFA, Inc v. Univ. of N.C.*,
2018 WL 4688388 (M.D.N.C. Sept. 29) ..................................................32

*SFFA, Inc. v. Pres. & Fellows of Harv. Coll.*,
980 F.3d 157 (1st Cir. 2020) ...................................................................32

*SFFA, Inc. v. Univ. of Tex. at Austin*,
37 F.4th 1078 (5th Cir. 2022) .......................................................... 32, 36

*Shea v. Kerry*,
796 F.3d 42 (D.C. Cir. 2015) ........................................................... 36, 38

*Simmons v. UBS Fin. Servs., Inc.*,
972 F.3d 664 (5th Cir. 2020) ...................................................................43

*Smith v. Moss L. Firm, P.C.*,
2019 WL 201839 (N.D. Tex. Jan. 15) .....................................................23

*Snider v. Melindez*,
199 F.3d 108 (2d Cir. 1999) ...................................................................18

*Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*,
   760 F.2d 1347 (2d Cir. 1985) ...................................................... 17, 18, 24

*Staco Elec. Constr. Co. v. City of Kansas City*,
   2021 WL 918764 (W.D. Mo. Mar. 10) .......................................... 41

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*,
   552 U.S. 148 (2008) ....................................................................... 45

*Summers v. Earth Island Institute*,
   555 U.S. 488 (2009) ................................................................. passim

*Tenn. Republican Party v. SEC*,
   863 F.3d 507 (6th Cir. 2017) ........................................................ 28

*Tomei v. Parkwest Med. Ctr.*,
   24 F.4th 508 (6th Cir. 2022) ......................................................... 22

*UAW v. Brock*,
   477 U.S. 274 (1986) ....................................................................... 42

*United States v. Hardin*,
   998 F.3d 582 (4th Cir. 2021) ........................................................ 45

*United States v. Restrepo*,
   986 F.2d 1462 (2d Cir. 1993) ....................................................... 21

*Univ. of Tex. v. Camenisch*,
   451 U.S. 390 (1981) ....................................................................... 20

*Vega v. Hempstead Union Free Sch. Dist.*,
   801 F.3d 72 (2d Cir. 2015) ........................................................... 29

*Velez v. Levy*,
   401 F.3d 75 (2d Cir. 2005) ........................................................... 48

*Viking River Cruises, Inc. v. Moriana*,
   142 S.Ct. 1906 (2022) ................................................................... 10

*Warth v. Seldin*,
   495 F.2d 1187 (2d Cir. 1974) ............................................. 12, 44, 45

*Warth v Seldin*,
   422 U.S. 490 (1975) ............................................................... 12, 44

*Williams v. N.Y. Office of Mental Health*,
   2011 WL 2708378 (E.D.N.Y. July 11) ........................................ 19

*Williams v. N.Y.C. Hous. Auth.*,
   2023 WL 2171483 (2d Cir. Feb. 23) ............................................ 45

*YAF v. Gates*,
  560 F. Supp. 2d 39 (D.D.C. 2008) ................................................... 31
*YAF v. Gates*,
  573 F.3d 797 (D.C. Cir. 2009) ........................................................ 31

## Statutes

28 U.S.C. §1291 ................................................................................... 2

28 U.S.C. §1331 ........................................................................ 2, 43, 45

28 U.S.C. §1361 ................................................................................. 43

28 U.S.C. §1367 ................................................................................... 2

42 U.S.C. §1981 ............................................................................... 2, 4

42 U.S.C. §18116 ............................................................................... 22

42 U.S.C. §2000d-3 ................................................................. 13, 21, 22

42 U.S.C. §2000d-4a ............................................................................ 4

N.Y. Exec. Law §296(1) ....................................................................... 4

N.Y. Exec. Law §296(1-a) .................................................................... 4

N.Y. Exec. Law §296-c(2) .................................................................... 4

N.Y.C. Admin. Code §8-107(1) ............................................................. 4

N.Y.C. Admin. Code §8-107(2) ............................................................. 4

N.Y.C. Admin. Code §8-107(23) ........................................................... 4

## Rules

Fed. R. Civ. P. 9 ................................................................................. 41

Fed. R. Civ. P. 10 ............................................................................... 32

Fed. R. Civ. P. 15 ............................................................................... 24

## Regulations

45 C.F.R. §92.3 ................................................................................... 4

# INTRODUCTION

Racial discrimination is illegal—even when the victims are white or Asian, even when the perpetrator is a private company, and even when the company thinks its motives are benign. Those principles have been enshrined in law for a long time. Several statutes apply those principles to private actors by making them follow the Supreme Court's equal-protection precedents. *E.g.*, *Gratz v. Bollinger*, 539 U.S. 244, 276 n.23 (2003) (Title VI and 42 U.S.C. §1981). Under those precedents, all racial classifications must survive strict scrutiny, and blatant racial exclusions never do. *Adarand Constr's, Inc. v. Peña*, 515 U.S. 200, 228-29 (1995); *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 506-08 (1989).

Yet Pfizer—one of the 50 biggest companies in America—created a program that flagrantly violates these principles. Its Breakthrough Fellowship is a prestigious, five-year program that promises college students two internships, a free master's degree, and a career. But according to Pfizer, whites and Asians need not apply. The fellowship requires applicants to be African-American, Hispanic, or Native American. Do No Harm, on behalf of its white and Asian members who are able and ready to apply, sued Pfizer over its fellowship and quickly sought a preliminary injunction.

Instead of enjoining Pfizer's discriminatory fellowship, the district court made a series of procedural errors. It sua sponte dismissed the entire case, even though it gave Do No Harm no notice that dismissal was on the table. It ruled that Pfizer was not subject to Title VI or the Affordable Care Act, even though that ruling required it to

raise arguments Pfizer didn't and to discredit allegations that it had to accept as true. It held that Do No Harm must disclose members' actual names, even though courts uniformly reject that requirement at the pleading stage. It held that Do No Harm had to allege standing "with particularity," even though no heightened pleading standard applies to standing. And it held that associations cannot sue under 42 U.S.C. §1981, even though the cases it cited all concern a different statute.

Though Do No Harm respectfully disagrees with the denial of its preliminary injunction, this appeal concerns the district court's sua sponte dismissal. When district courts make this error, this Court often vacates and remands with instructions to consider the issues anew once an actual motion to dismiss is filed. This Court should order that relief for Do No Harm's claims under Title VI and the Affordable Care Act. But because the other issues concern either a pure question of law or jurisdiction, this Court should consider them now. On those questions, this Court should reverse the dismissal of Do No Harm's claim under §1981 because its complaint plausibly alleges standing. In brief, this Court should vacate in part, reverse in part, and remand.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction because Do No Harm alleged that Pfizer violated federal civil-rights laws and because Do No Harm's non-federal claims were part of the same controversy. 28 U.S.C. §1331; §1367. This Court has jurisdiction because Do No Harm appeals from a final order dismissing its entire case. §1291. The district

court entered that order on December 16, 2022, and Do No Harm timely appealed on

January 3, 2023. JA135.

## STATEMENT OF THE ISSUES

**I.** Whether this Court should vacate the dismissal of Do No Harm's claims under

Title VI and the Affordable Care Act because the district court procedurally erred by

sua sponte dismissing the complaint without notice.

**II.** Whether this Court should reverse the dismissal of Do No Harm's claim

under §1981 because the complaint plausibly alleges standing.

**A.** Whether, at the pleading stage, Do No Harm must disclose its members' actual names.

**B.** Whether Do No Harm plausibly alleged that one of its members is able and ready to apply to the fellowship once Pfizer stops using race.

**C.** Whether associations are categorically barred from bringing claims on behalf of their members under 42 U.S.C. §1981.

**III.** Whether, if this Court vacates or reverses the dismissal of at least one of Do

No Harm's federal claims, it should also reinstate Do No Harm's state and local claims.

## STATEMENT OF THE CASE

As a major New York company that receives millions in federal healthcare funds,

Pfizer is subject to several bans on racial discrimination. It runs a fellowship, however,

that explicitly excludes certain applicants based on race. When Do No Harm moved to

preliminarily enjoin that racial discrimination, the district court sua sponte dismissed

3

the case on several procedurally flawed grounds. *See Do No Harm v. Pfizer Inc.*, 2022 WL 17740157 (S.D.N.Y. Dec. 16) (Rochon, J.).

## I. Pfizer is barred from discriminating based on race.

Pfizer is subject to many federal, state, and local bans on racial discrimination. *E.g.*, 42 U.S.C. §1981 (no discrimination in contracts); N.Y. Exec. Law §296-c(2) (internships), §296(1-a)(b) (training programs), §296(1)(a) (employment); N.Y.C. Admin. Code §8-107(23) (internships), §8-107(2)(b) (training programs), §8-107(1)(a)(2) (employment). Two of those federal bans—Title VI of the Civil Rights Act of 1964 and §1557 of the Affordable Care Act—apply when an a federal-funding recipient is either principally engaged in providing healthcare or receives federal funds "as a whole." *See* 42 U.S.C. §2000d-4a; 45 C.F.R. §92.3. Pfizer fits that bill, as alleged in Do No Harm's complaint. *See* JA10 ¶¶18-21; JA18 ¶¶88-93; JA20 ¶112.

Pfizer is a healthcare pharmaceutical company that develops and manufactures medicines and other therapeutics for patients. JA10 ¶18. Its principal focus is healthcare. JA10 ¶19. Pfizer participates in the federal healthcare program, including Medicare and Medicaid, by offering federally reimbursable products and medicines. JA10 ¶20. Pfizer also works with healthcare providers, government health agencies, various research hospitals and institutes, and other pharmaceutical companies. JA10 ¶21. For instance, at least between 2014 and 2019, Pfizer hosted researchers from the National Institutes of Health. JA10 ¶22. And Pfizer is part of the Accelerating Medicines Partnership, a public-private partnership between NIH, the Food and Drug

Administration, and other pharmaceutical companies. JA10 ¶23. The partnership pulls together the collective expertise and resources of NIH, FDA, industry, and patient-advocacy organizations to increase "the number of new diagnostics and therapies for patients and reduce the time and cost of developing them." JA10 ¶24. NIH provides a significant portion of the partnership's budget, totaling over $100 million just for the programs with Pfizer. JA11 ¶¶27-29.

## II.    Pfizer's Breakthrough Fellowship excludes whites and Asians.

In 2021, Pfizer launched the Breakthrough Fellowship Program. JA11 ¶31. The fellowship is a prestigious, multi-year program that college students apply for when they're juniors. JA11 ¶¶32-33. The fellowship consists of five components. JA11 ¶33. Fellows first complete a 10-week summer internship with Pfizer between their junior and senior years. JA12 ¶34. After they graduate college, fellows work at Pfizer for two years. JA12 ¶35. Pfizer then pays for fellows to get a master's degree (either an MBA, MPH, or MS in statistics). JA12 ¶36. In the summer between their first and second years of grad school, fellows intern for Pfizer again. JA12 ¶37. And after they graduate with a masters, fellows return to work at Pfizer. JA12 ¶38. This fellowship, according to Pfizer, is "first-of-its-kind." JA12 ¶39.

To apply to the fellowship, applicants must meet a few nonracial requirements. They must be a U.S. citizen or permanent resident and a full-time college student. JA12 ¶42. They also must have a 3.0 GPA or better, intend to pursue a master's, and demon-

5

strate exceptional leadership potential. JA12 ¶42. And they, of course, must be willing to work at Pfizer. JA12 ¶42.

According to Pfizer, however, applicants cannot be white or Asian. JA13 ¶43. The fellowship's eligibility criteria state that applicants must "[m]eet the program's goals of increasing the pipeline for Black/African American, Latino/Hispanic and Native Americans." JA13 ¶45. In other words, only Black/African American, Latino/Hispanic, and Native American applicants can apply. JA13 ¶44. Pfizer has never offered "any alternative interpretation" of this requirement or explained "how candidates who are not Black/African American, Latino/Hispanic and Native Americans could meet the program's stated goal." JA111. Below, Pfizer repeatedly admitted that the fellowship is race-based. *E.g.*, D.Ct. Doc. 30 at 12-13 (program was "specifically designed" to hire more people of these three races); *id.* at 23 (defending the Fellowship's "use of racial selection criterion"); *id.* at 24 ("The Fellowship's race-based criterion is justified"). And its informational materials make clear—complete with cartoons depicting racial minorities—that fellows will "com[e] from underrepresented groups," meaning "Black African American," "Latino Hispanic," and "Native American." JA13 ¶¶47; JA54.

6



coming from underrepresented groups and lead on this organization.

### III. Do No Harm's white and Asian members cannot apply to Pfizer's fellowship on an equal footing.

Do No Harm is a nationwide membership organization. Its members include a diverse group of physicians, healthcare professionals, students, patients, and policymakers who want to protect healthcare from radical, divisive, and discriminatory ideologies. JA9 ¶9. Do No Harm accomplishes its mission through education, advocacy, and litigation. JA9 ¶10.

Do No Harm has several members who are harmed by Pfizer's discriminatory fellowship. JA14-15 ¶49, ¶70. Though it didn't need to, the complaint identifies two of those members with specificity. "Member A" and "Member B" meet all the fellowship's nonracial criteria. JA14-15 ¶57, ¶67. They are full-time juniors at Ivy League universities. JA14-15 ¶51, ¶61. They are U.S. citizens and have GPAs higher than a 3.0. JA14-15 ¶¶52-53, ¶¶62-63. They are both actively involved on campus and hold leadership positions in student organizations. JA14-15 ¶54, ¶64. Both want to apply to the fellowship

because it's a prestigious program that would provide great professional development opportunities and allow them to meet career mentors. JA14-15 ¶55, ¶65. Both want to work in Pfizer's New York City office next summer and are especially drawn to Pfizer's offer to fully fund their future MBAs. JA14-15 ¶¶55-56, ¶¶65-66.

As alleged in the complaint, Members A and B are able and ready to apply for the 2023 class of fellows once Pfizer stops discriminating. JA14-15 ¶58, ¶68. And if accepted, they will meet all the program's requirements and expectations. JA15 ¶59, ¶69. But because Member A is white and Member B is Asian, they are ineligible. JA14-15 ¶57, ¶67. Though the application window for the 2023 class of fellows was originally supposed to open in August 2022, JA14 ¶48, Pfizer delayed it due to this litigation. Pfizer recently announced that the window for the 2023 class opened on February 15 and closed on March 1. *See* Pfizer, *Breakthrough Fellowship Program* (archived on Feb. 15, 2023), perma.cc/8G4Z-EFT9; JA84. It has not said, either to the public or to Do No Harm, when selections will be made. Selected fellows will begin the first stage of the program this summer. JA84.

Do No Harm has other members besides A and B who are being discriminated against by Pfizer. *See* JA15 ¶70; 2d Suppl. Rasmussen Decl. (CA2 Doc. 38-3) ¶3. Member C, who is Asian, is able and ready to apply for the 2024 class once Pfizer stops discriminating. *See* Member C Decl. (CA2 Doc. 38-2) ¶2, ¶13. Like Members A and B, Member C meets all the nonracial criteria for the fellowship. ¶2. A sophomore now, he will be a junior and thus eligible to apply for the 2024 cycle. ¶3. He is a full-time student

at one of the best public universities, has a high GPA, wants to get an MBA, has significant leadership experience, wants to work at Pfizer, and more. ¶¶3-10. Member C would also help Pfizer become a more diverse, equitable, and inclusive company. ¶9. But because Pfizer uses race, Member C cannot equally compete for a spot in 2024. ¶¶12-13.

## IV.   The district court sua sponte dismisses Do No Harm's lawsuit.

In September 2022, Do No Harm sued Pfizer on behalf of its members, alleging violations of 42 U.S.C. §1981, Title VI, the Affordable Care Act, and several state and local laws. JA16-31. Do No Harm simultaneously sought a temporary restraining order and preliminary injunction. JA2. Do No Harm withdrew the TRO based on Pfizer's representation that the application window for the 2023 class would not open before January 2023, thus giving the parties time to litigate the preliminary injunction. JA99. The parties submitted their preliminary-injunction briefs in November 2022. JA99. Pfizer never answered the complaint or filed a motion to dismiss. In fact, the district court stayed Pfizer's deadline to answer or file a motion to dismiss until 21 days after the preliminary-injunction motion was resolved, including any interlocutory appeal. D.Ct. Doc. 27; JA5.

In December 2022, the district court issued an order denying Do No Harm's preliminary-injunction motion. JA91. Again, Pfizer had not filed a motion to dismiss, Pfizer had not asked for dismissal in its preliminary-injunction brief, and the district court had not given the parties notice that it was contemplating dismissal. Yet in its

order denying the preliminary injunction, the district court sua sponte dismissed the entire case. JA132-33; JA6.

The district court dismissed because it thought that Do No Harm lacked standing, both constitutional and statutory.[1] JA102. The court never cited or applied the motion-to-dismiss standard. It did not address whether the complaint's allegations put Pfizer on fair notice under Rule 8, assume that Do No Harm's factual allegations were true, or draw inferences in Do No Harm's favor. It also considered and weighed evidence outside the complaint. And throughout, it raised arguments that Pfizer didn't. The court justified this aggressive disposition by citing cases that, it said, require courts to sua sponte dismiss after denying preliminary injunctions for lack of likely standing. *See* JA132-33.

On Article III standing, the district court first faulted Do No Harm for not divulging the real names of Members A and B. In its opposition, Pfizer used the members' anonymity as a reason why their *declarations* were insufficient to support a preliminary injunction. *See* D.Ct. Doc. 30 at 18-20. But the district court used their anonymity as a basis to challenge whether Do No Harm's *complaint* plausibly alleged associational standing. Relying on *Summers v. Earth Island Institute*, the court held that associations must

---

[1] By "statutory standing," Do No Harm means "simply [the] question of whether a particular plaintiff 'has a cause of action under the statute.'" *Am. Psychiatric Ass'n, Inc. v. Anthem Health Plans, Inc.*, 821 F.3d 352, 359 (2d Cir. 2016) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 (2014)). Though this phrase is a "'misnomer,'" *id.*, the term is familiar and courts still use it, including the district court here. *E.g.*, *Viking River Cruises, Inc. v. Moriana*, 142 S.Ct. 1906, 1914 (2022). Do No Harm will use it here too for convenience.

10

"identify at least one member by name." JA108 (discussing 555 U.S. 488 (2009)). Though *Summers* was an appeal from final judgment, the district court said it also applies at "the pleading stage." JA108-09. The district court never addressed this Court's decision in *Building & Construction Trades Council of Buffalo v. Downtown Development, Inc*, 448 F.3d 138 (2d Cir. 2006), which rejected "the proposition that an association must 'name names' in a complaint." *Id.* at 145. The court also cited cases involving the anonymity of "'parties,'" even though Members A and B aren't parties. JA106. And it claimed that these members' names were necessary to "'verif[y] the facts' upon which standing depends," without explaining why. JA107.

The district court next ruled that Members A and B were not "'able and ready'" to apply to the fellowship. JA110. Relying on *Carney v. Adams*, 141 S.Ct. 493 (2020)—a summary-judgment case that Pfizer never cited—the court held that applicants must present "'evidence'" that they are truly able and ready. JA111-15. Though it recognized Do No Harm's many allegations about A and B's ability and readiness, the court faulted Do No Harm for not alleging their interests and qualifications "with particularity." JA113-14. It criticized the complaint for having "no allegations" that these members had "pursued opportunities similar to the Fellowship in the past"; for not disclosing their college majors; and for not alleging their "prior involvement with or interest in Pfizer, biopharmaceutical companies, or business management." JA114. The court also cited the fact that Members A and B support this lawsuit and joined Do No Harm—a

11

"newly created organization" that opposes "affirmative action"—as proof that they have only a "generalized grievance." JA114.

As for statutory standing, the district court held that associations like Do No Harm cannot sue on behalf of their members under §1981. The court relied on a line of circuit precedent, starting with *Aguayo v. Richardson*, 473 F.2d 1090 (2d Cir. 1973), that bars associational standing under §1983. JA116. The district court did not explain why these precedents on §1983 should also govern §1981. It insisted that this Court had *already* extended them to §1981 in *Warth v. Seldin*, and it noted that this Court had "approvingly cited" *Warth* in one case in 1984. JA117 (citing *League of Women Voters of Nassau Cnty. v. Nassau Cnty. Bd. of Supervisors*, 737 F.2d 155, 160-61 (2d Cir. 1984), in turn citing *Warth v. Seldin*, 495 F.2d 1187, 1194 (2d Cir. 1974), *aff'd on different grounds*, 422 U.S. 490 (1975)). The district court did not consider whether *Warth*—a case involving a governmental defendant that Pfizer never cited—was itself a §1983 case.

The district court next held that Do No Harm cannot sue under Title VI or the Affordable Care Act. The Breakthrough Fellowship receives no federal funding, the district court observed, so Title VI and the ACA don't apply unless Pfizer is principally engaged in providing healthcare or receives federal assistance "as a whole." JA119. On the first question, the district court credited the "facts" in Pfizer's preliminary-injunction declarations denying that Pfizer provides healthcare. JA126 & n.10. On the second question, the district court claimed that Do No Harm failed to plead that Pfizer receives federal assistance as a whole. JA131. It also determined that, unlike Title VI, the

Affordable Care Act is not implicated when an entity receives federal assistance as a whole—yet another argument that Pfizer never made. JA129.

Alternatively, the district court held that neither statute applies because Pfizer doesn't receive federal funds "for the primary purpose of providing employment." JA119-20. Pfizer did not brief this argument below: It didn't make the argument at all for the ACA, and it included only one undeveloped footnote for Title VI. *See* D.Ct. Doc. 30 at 29 n.11. The district court spun that lone footnote into a five-page analysis of both Title VI and the ACA, and then faulted Do No Harm for "not address[ing]" it. JA119-24. The district court got this "primary purpose" requirement from 42 U.S.C. §2000d-3, a statute that addresses when a "department or agency" can sue under Title VI to challenge an "employment practice." The district court did not explain why the fellowship is an employment practice, and it unilaterally determined that this statute about Title VI also governs the ACA. *See* JA121-23.

Finally, the district court, having dismissed all the federal claims, "decline[d] to exercise supplemental jurisdiction over [the] non-federal claims." JA134. Do No Harm timely appealed. JA135. The parties agreed that this appeal should be expedited, *see* Consent Mot. to Expedite Appeal (CA2 Doc. 24), and this Court placed it on the "standard" expedited appeals calendar, *see* Mot. Order (CA2 Doc. 35); LR 31.2 Notice (CA2 Doc. 36).

*　　*　　*

A few weeks before this brief was due, Do No Harm learned that Pfizer has modified its description of the Breakthrough Fellowship. Instead of stating that applicants must "[m]eet the program's goals of increasing the pipeline for Black/African American, Latino/Hispanic and Native Americans," Pfizer's website now says that applicants must have a "[d]emonstrated commitment and ability to advance diversity, equity and inclusion for Black/African American, Latino/Hispanic and Native Americans at Pfizer, in particular growing the pipeline of Black/African American, Latino/Hispanic and Native Americans at Pfizer." *Compare* JA48, *with* Pfizer, *Breakthrough Fellowship Program* (archived on Feb. 15, 2023), perma.cc/8G4Z-EFT9. On a separate FAQs page, Pfizer has now added a sentence claiming that applicants "are eligible to apply for the Breakthrough Fellowship regardless of whether [they] are of Black/African American, Latino/Hispanic, or Native American descent." Pfizer, *Breakthrough Fellowship FAQs* (archived on Feb. 15, 2023), perma.cc/ZK5D-BKD7. Pfizer made these edits without making an announcement, without stating that anything about the fellowship has changed, and without even telling Do No Harm. *See* 2d Suppl. Rasmussen Decl. ¶¶5-6.

Pfizer has not suggested that these modifications affect Do No Harm's appeal. Pfizer has not claimed that the fellowship is now race neutral or suggested that it won't give a preference to applicants from the listed races. Nor has Pfizer moved to dismiss this appeal or suggested mootness. Should Pfizer make that argument later, Do No Harm will respond then. *See Golden v. City of Columbus*, 404 F.3d 950, 963 n.10 (6th Cir.

14

2005) ("Because [defendant] does not assert mootness"—a "'heavy burden'" that the law places on defendants when they attempt voluntary cessation—"it follows that [defendant's] adoption of the new rule does not moot [plaintiff's] equal protection claim.").

## SUMMARY OF ARGUMENT

Pfizer's silent adjustment to its website does signal one thing though: It knows the district court's sua sponte dismissal cannot withstand scrutiny. If Pfizer tries to defend that dismissal now, this Court should remember that everything Pfizer says on appeal is something it didn't argue below. Pfizer didn't file a motion to dismiss. In the one brief it did file—an opposition to a preliminary injunction—it didn't attack the complaint, cite the pleading standard, or explain how its arguments were even cognizable at the pleading stage. The district court did all that work itself, citing cases and even raising whole defenses that Pfizer failed to. Along the way, the district court never applied the motion-to-dismiss standard—where the complaint's allegations must be accepted as true, general allegations suffice, everything is construed in the plaintiff's favor, and external evidence is forbidden. And the district court never gave Do No Harm any warning that its sua sponte dismissal was coming.

This Court should vacate with respect to Title VI and the ACA because the district court's sua sponte dismissal prejudiced Do No Harm on those claims. When analyzing those claims, the district court credited evidence outside the complaint and otherwise failed to apply the pleading standard. It also raised arguments that Pfizer avoided and then used those arguments as a basis for dismissal, without ever giving Do No

15

Harm a chance to respond. Its reasoning is incomplete, incorrect, and far-reaching—precisely the kind of thing that should be decided on remand after full adversarial briefing. And even if the district court were right, Do No Harm could address every defect it identified with the complaint by exercising its right to amend. Yet the district court's sua sponte dismissal denied Do No Harm that right too.

Though the district court shouldn't have dismissed any claim sua sponte, this Court should consider Do No Harm's claim under §1981 itself and reverse. And because it should consider that claim, it should also decide whether Do No Harm's complaint plausibly alleges Article III standing. On those questions, the district court badly erred. This Court has already held that associations do not have to identify members by name in their complaint, and that precedent remains good law. This Court has also rejected any heightened pleading standard for Article III standing—a principle that the district court dishonored in requiring Do No Harm to allege its members' intentions with "evidence" and "particularity." Nor does §1981 categorically bar associational standing. While this Court has precedents saying that §1983 bars associational standing, the text, history, and caselaw surrounding §1981 are fundamentally different—at least in cases like this one, where the defendant is a private actor.

This Court should vacate in part, reverse in part, and remand for further proceedings.

## STANDARD OF REVIEW

This Court "review[s] a district court's sua sponte dismissal of an action and its complaint de novo." *J.S. v. T'Kach*, 714 F.3d 99, 103 (2d Cir. 2013).

## ARGUMENT

The district court procedurally erred by dismissing Do No Harm's complaint sua sponte. While this Court should vacate the dismissal of Do No Harm's claims under Title VI and the ACA based on that error alone, it should exercise its discretion to consider Do No Harm's claim under §1981 now. Under the motion-to-dismiss standard, Do No Harm plausibly alleged both constitutional and statutory standing for that claim. And because the federal claims were improperly dismissed, Do No Harm's state and local claims should be reinstated.

## I. This Court should vacate the dismissal of Do No Harm's claims under Title VI and the ACA because the district court erred by sua sponte dismissing the case.

The district court's decision must, at a minimum, be vacated because it violated a basic procedural rule: It dismissed the case sue sponte, without first giving Do No Harm notice or an opportunity to be heard. In this circuit, an improper sua sponte dismissal "'is, by itself, grounds for reversal.'" *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 760 F.2d 1347, 1365 (2d Cir. 1985). This Court has repeatedly "instructed district courts … 'not [to] dismiss an action pending before it without first providing the adversely affected party with notice and opportunity to be heard.'" *Int'l Code Council, Inc. v. UpCodes, Inc.*, 43 F.4th 46, 53 (2d Cir. 2022) (quoting *McGinty v. New York*, 251

F.3d 84, 90 (2d Cir. 2001)). In other words, district courts have "*no* authority to dismiss for failure to state a claim" without providing notice and an opportunity to be heard. *Square D*, 760 F.2d at 1365 (emphasis added). This bar applies to all sua sponte dismissals, including a "sua sponte dismissal for lack of subject matter jurisdiction." *Catzin v. Thank You & Good Luck Corp.*, 899 F.3d 77, 82 (2d Cir. 2018).

This rule serves important purposes. Notice prior to dismissal "secur[es] an opportunity for the non-moving party to muster his best argument, to plan his strategy, and to put his best foot forward." *Schlesinger Inv. P'Ship v. Fluor Corp.*, 671 F.2d 739, 742 (2d Cir. 1982). It also increases the "'fairness and reliability' of the court's decision." *Catzin*, 899 F.3d at 82. Sua sponte dismissals increase "the risk that the court may overlook valid answers to its perception of defects in the plaintiff's case." *Snider v. Melindez*, 199 F.3d 108, 113 (2d Cir. 1999). And these dismissals "deviate from the traditions of the adversarial system by making the judge 'a proponent rather than an independent entity.'" *Perez v. Ortiz*, 849 F.2d 793, 797 (2d Cir. 1988). They also waste judicial resources "by leading to appeals and remands." *Id.*

The district court violated this rule. The only motion before it was Do No Harm's motion for a preliminary injunction. *See* JA5-6. In its opposition to that motion, Pfizer never suggested that the Court should go ahead and dismiss the whole case. And the district court never notified the parties that it was considering dismissal. If anything, it notified the parties of the opposite: It suggested that dismissal was *not* on the table by staying Pfizer's obligation to file a motion to dismiss until after the preliminary injunc-

18

tion was decided and appealed. JA5. The district court thus caught Do No Harm by surprise when, in its order denying a preliminary injunction, it also dismissed the entire case. The court seemed to appreciate that fact, as it preemptively found and cited five cases that it thought justified this kind of dismissal. *See* JA132-33.

None of the district court's cases justified what it did. Some didn't involve a sua sponte dismissal at all. *E.g.*, *Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 244-45 (2d Cir. 2008) ("defendants moved … to dismiss"); *Rojas v. Cigna Health & Life Ins. Co.*, 793 F.3d 253 (2d Cir. 2015) (district court didn't dismiss).[2] Others involved sua sponte dismissals but first gave the plaintiffs notice and an opportunity to be heard. *E.g.*, *Williams v. N.Y. Office of Mental Health*, 2011 WL 2708378, *1 (E.D.N.Y. July 11) (dismissal after magistrate judge had recommended it and plaintiff had objected to it). And others involved the rare sua sponte dismissals that are appropriate because the case is "'frivolous.'" *Lewis v. New York*, 547 F.2d 4, 6 n.5 (2d Cir. 1976); *e.g.*, *Pietsch v. Bush*, 755 F. Supp. 62, 65 (E.D.N.Y. 1991) (plaintiff asked the court to enjoin President Bush from launching military operations in Iraq).

---

[2] Though *Rojas* said it was "affirming [the district court's] decision dismissing the case," 793 F.3d at 259, the Court meant that it agreed with the district court on the likely merits. *Rojas* was an appeal from the denial of a preliminary injunction; the district court hadn't dismissed the complaint in the decision below. *See id.* at 256 (discussing the procedural history); Order (Doc. 29), No. 14-cv-6368 (S.D.N.Y. Sept. 16, 2014) (denying a preliminary injunction); Notice of Appeal (Doc. 31), No. 14-cv-6368 (S.D.N.Y. Sept. 17, 2014) (appealing only that denial of a preliminary injunction); Mem. in. Supp. of Pet. for Reh'g (Doc. 162-2) at 1, No. 14-3455 (2d Cir. Aug. 3, 2015) (noting that the case was never dismissed).

It is no answer to say that Do No Harm briefed some of these issues in its preliminary-injunction papers. "[I]t is generally inappropriate for a federal court at the preliminary-injunction stage to give a final judgment on the merits," *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981), including a dismissal for lack of standing, *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015). Dismissal is inappropriate because the standard for granting a motion to dismiss is substantially different from the standard for denying a preliminary injunction. *See New Hope Family Servs., Inc. v. Poole*, 966 F.3d 145, 160, 180 (2d Cir. 2020). Preliminary injunctions also serve a "limited purpose," are litigated in "haste," and involve "procedures that are less formal and evidence that is less complete." *Camenisch*, 451 U.S. at 395. And the stakes are different. The argument that a "'hearing on the preliminary injunction effectively presented all of the issues'" anyway "'is inapposite, for loss of a motion for preliminary injunction means only temporary lethality. Final judgment is not then a possibility.'" *Gellman v. Maryland*, 538 F.2d 603, 605 (4th Cir. 1976). That the parties briefed a preliminary injunction "'does not sanction the court in changing, sub silentio, the nature of the game at halftime.'" *Id.*

Based on the district court's procedural error, this Court should vacate the dismissal of Do No Harm's claims under Title VI and the ACA. The court's sua sponte dismissal prejudiced Do No Harm on these claims in three main ways.

**1.** Typical of sua sponte dismissals, the district court raised arguments that Pfizer did not. *See Perez*, 849 F.2d at 797. Most notably, it ruled that the Breakthrough

Fellowship cannot be challenged under Title VI or the ACA unless Pfizer "receives federal financial assistance for the primary purpose of providing employment." JA119-20 (citing 42 U.S.C. §2000d-3). Pfizer, in its preliminary-injunction opposition, did not make this argument *at all* with respect to the ACA. *See* D.Ct. Doc. 30 at 29 n.11. With respect to Title VI, Pfizer failed to raise the argument by merely gesturing at it in a lone footnote. *Id.*; *see Rowley v. City of N.Y.*, 2005 WL 2429514, at *6 (S.D.N.Y. Sept. 30) ("mere mention in a footnote does not amount to raising an argument and it would be unfair to penalize Plaintiffs for failing to respond to it"); *United States v. Restrepo*, 986 F.2d 1462, 1463 (2d Cir. 1993) ("We do not consider an argument mentioned only in a footnote to be adequately raised"). The district court thus altered the litigation by taking on an adversarial role, developing this issue on its own, and then using it as a basis to sua sponte dismiss. Because "statutory standing is not jurisdictional," Pfizer would have "forfeited" this argument had it not developed the defense in an actual motion to dismiss. *Paulsen v. Remington Lodging & Hosp., LLC*, 773 F.3d 462, 468 (2d Cir. 2014). And because the district court developed the point on its own, Do No Harm got no real opportunity to respond. *See Perez*, 849 F.2d at 797 (explaining that sua sponte dismissals deprive parties of "the opportunity to present their best arguments in opposition").

Had Do No Harm been on notice that this argument was raised (let alone raised as a basis for dismissal), it would have pointed out several holes in the district court's analysis. The statute that the court cited applies only to actions by a "department or

agency,"[3] under "this subchapter," challenging an "employment practice." 42 U.S.C. §2000d-3. While Title VI appears under "this subchapter"—meaning subchapter V— the relevant provision of the ACA appears not only in a different subchapter, but in a different chapter altogether. *See* 42 U.S.C. §18116(a). The ACA does not incorporate this limitation from Title VI just because it incorporates Title VI's "enforcement mechanism," §18116(a); *see Consol. Rail Corp. v. Darrone*, 465 U.S. 624, 632 (1984); *Tomei v. Parkwest Med. Ctr.*, 24 F.4th 508, 514 (6th Cir. 2022). The district court also didn't explain why the fellowship is an "employment practice" within the meaning of §2000d-3. Two stages of the fellowship involve employment, but the other three do not. *See* JA12 (¶¶34-38). It is unclear why Congress would want to immunize racial discrimination in non-employment programs (internships, scholarships, fellowships) just because the defendant bundled them with employment opportunities. Pfizer must agree, since its "counsel did not consider [this argument] of sufficient importance to include" above the line in its brief below. *Restrepo*, 986 F.2d at 1463.

**2.** The district court also prejudiced Do No Harm by failing to apply the motion-to-dismiss standard. For example, it held that Pfizer is not "principally engaged" in healthcare based entirely on outside evidence that Pfizer attached to its preliminary-

---

[3] Do No Harm is a private entity, not a governmental department or agency. *See Jones v. Metro. Atlanta Rapid Transit Auth.*, 681 F.2d 1376, 1377 n.7 (11th Cir. 1982) (noting that §2000d-3, on its face, applies "only to suits brought by federal agencies or departments and not suits brought by private individuals"). But this Court has assumed that §2000d-3 also applies to Title VI suits brought by private plaintiffs. *See Ass'n Against Discrimination in Emp., Inc. v. City of Bridgeport*, 647 F.2d 256, 276 (2d Cir. 1981).

injunction opposition. *See* JA126-27. The court faulted Do No Harm's *complaint* for not anticipating and rebutting the "specific and supported facts proffered by Defendant" in its opposition to the *preliminary injunction*. JA126 n.10. That outside evidence was off-limits at the pleading stage, especially since statutory standing is a nonjurisdictional question that arises under Rule 12(b)(6), not Rule 12(b)(1). *See DiFolco v. MSNBC Cable, LLC*, 622 F.3d 104, 111 (2d Cir. 2010); *Smith v. Moss L. Firm, P.C.*, 2019 WL 201839, at *2-3 (N.D. Tex. Jan. 15). The district court should have limited itself to the complaint, accepted Do No Harm's allegations as true, and construed its general allegations to include the necessary specifics. *See Hu v. City of New York*, 927 F.3d 81, 88-89 (2d Cir. 2019); *John v. Whole Foods Mkt. Grp., Inc.*, 858 F.3d 732, 736-37 (2d Cir. 2017); *DiFolco*, 622 F.3d at 111.

Unlike the cases where plaintiffs never alleged that the defendant was principally engaged in healthcare, *see* JA126-27 (citing *Bernier v. Trump*, 242 F. Supp. 3d 31, 44 (D.D.C. 2017); and *Drachman v. Boston Sci. Corp.*, 258 F. Supp. 3d 207, 211-12 (D. Mass. 2017)), Do No Harm made precisely that allegation here, *see* JA10 ¶¶18-21; JA18 ¶¶88-90; JA20 ¶112. Indeed, Pfizer holds itself out as a healthcare company, participates in federal healthcare programs, is heavily regulated by HHS, and works substantially with private and public actors in healthcare (hospitals, FDA, NIH, etc.). *See* JA10 ¶¶18-21; JA20 ¶¶112-13. If pharmacies can be principally engaged in healthcare, *see, e.g., Doe One v. CVS Pharmacy, Inc.*, 2022 WL 3139516, at *3, *9 (N.D. Cal. Aug. 5); *Callum v. CVS Health Corp.*, 137 F. Supp. 3d 817, 852 (D.S.C. 2015), then so can Pfizer. Perhaps Pfizer

will prove otherwise at summary judgment, after the parties present the evidence about Pfizer's operations that they've uncovered in discovery. But the district court shouldn't have skipped ahead to make that finding now, preventing Do No Harm from proceeding at all based on a limited, one-sided peek at the evidence. *See Palin v. N.Y. Times Co.*, 940 F.3d 804, 815 (2d Cir. 2019).

**3.** Finally, like most sua sponte dismissals, the district court prejudiced Do No Harm by denying it the right to amend or seek discovery. *Perez*, 849 F.2d at 797; *Schlesinger*, 671 F.2d at 742-43. Had Pfizer filed a motion to dismiss, Do No Harm could have amended its complaint as of right. Fed. R. Civ. P. 15(a)(2). That amendment wouldn't have been futile: Every defect that the district court identified was something that Do No Harm supposedly *did not* plead, not something it *could not* plead. *See, e.g.*, JA123 ("does not even allege"); JA123 ("allegations … are insufficient"); JA126 n.10 ("threadbare and conclusory allegation"); JA131 ("pleading deficiencies"). Though Do No Harm stands by its complaint as drafted, it could have amended to add more about Pfizer's funding and activities to address the district court's criticisms. And it would have done so had Pfizer filed a motion to dismiss making those arguments.

For all these reasons, the district court's sua sponte dismissal prejudiced Do No Harm with respect to its claims under Title VI and the ACA. That procedural error is a sufficient reason to vacate the dismissal of those claims. *See Square D*, 760 F.2d at 1365; *Int'l Code Council*, 43 F.4th at 53. The district court can reconsider those claims on remand, after they've been briefed by the parties on an actual motion to dismiss.

24

This Court should not do the same for Do No Harm's claim under §1981, however. The district court dismissed that claim because, in its view, associations can never sue on behalf of their members under §1981. JA117. That ruling prejudiced Do No Harm because it was wrong, but not because it was sua sponte. Even if the district court had given Do No Harm a chance to amend, every version of the complaint would still have Do No Harm asserting associational standing under §1981. This Court thus can choose to review the district court's ruling on statutory standing now, instead of simply vacating and remanding based on the sua sponte dismissal. *See, e.g.*, *Int'l Code Council*, 43 F.4th at 56; *McGinty*, 251 F.3d at 90; *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 67 (2d Cir. 2012). It should.

If this Court reviews whether Do No Harm has statutory standing under §1981, it should also review whether Do No Harm's complaint plausibly alleged Article III standing. While this Court sometimes can bypass Article III standing when a plaintiff *lacks* statutory standing, it cannot bypass Article III standing when a plaintiff *has* statutory standing, as Do No Harm does under §1981. *See All. for Env't Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 86-87 (2d Cir. 2006). "If [Do No Harm] lacked Article III standing" but this Court held that it can sue under §1981, then this Court would have impermissibly "construed [§1981] in a case beyond the jurisdiction of a federal court." *Id.* at 87. So this Court should consider jurisdiction. Critically, though, the only jurisdictional question at this stage is whether Do No Harm *plausibly alleged* standing in its

complaint. *See John*, 858 F.3d at 737. Do No Harm will address that question, and then its right to sue under §1981, below.[4]

## II.    This Court should reverse the dismissal of Do No Harm's claim under §1981 because the complaint plausibly alleges standing.

Do No Harm adequately pleaded standing to sue under §1981. As a membership organization, Do No Harm has standing if one of its members has standing. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342 (1977). The district court held that Do No Harm lacks Article III standing because it failed to disclose its members' actual names, and because it failed to allege with specificity that its members are able and ready to apply. Those rulings misapply the pleading standard. The district court also held that Do No Harm lacks statutory standing because §1981 categorically bars associational standing. That ruling mistakenly extends circuit precedent governing §1983 to a different statute where it doesn't fit. This Court should reverse.

### A.    Do No Harm did not need to reveal its members' actual names in the complaint.

The district court's insistence on knowing the real names of Do No Harm's members was wrong for at least three reasons. Associations don't need to identify

---

[4] This Court should at least address whether Do No Harm needed to reveal its members' names in the complaint. Do No Harm could have addressed the district court's other ruling on standing—that the complaint doesn't plead enough to show that Members A and B are able and ready to apply—by amending its complaint, had Pfizer raised those arguments in a motion to dismiss. But even given a chance to amend, Do No Harm would not have disclosed its members' names in the complaint. This Court should address that question of anonymity now.

members at the pleading stage, as this Court squarely held in *Building & Construction*. Even if they did, Do No Harm identified specific members in its complaint—Members A and B—and nothing in *Summers* bars the use of pseudonyms. In all events, *Summers* does not require associations to identify their members in every case; and here, the names of Members A and B are irrelevant for concluding that Do No Harm plausibly alleged standing.

**1.** This Court has already rejected the district court's precise reasoning. In *Building & Construction*, the defendant moved to dismiss because the association's complaint "fail[ed] to state the names of the members" with standing. 448 F.3d at 144. This Court disagreed. That argument "might have some validity," this Court said, "if this litigation were at the summary judgment stage" and "[d]iscovery" were "substantially complete." *Id.* at 144-45. But the argument "is unpersuasive on a motion to dismiss." *Id.* at 145. At the pleading stage, "'general'" allegations of standing suffice because courts must assume that "'general allegations embrace those specific facts that are necessary to support the claim.'" *Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). Requiring associations to allege specific names would impermissibly impose a "heightened pleading requirement for allegations of standing." *Id.* This Court was aware of "no authority" supporting "the proposition that an association must 'name names' in a complaint." *Id.*; *accord Hancock Cnty Bd. of Sup'rs v. Ruhr*, 487 F. App'x 189, 198 (5th Cir. 2012)

(finding "no precedent holding that an association must set forth the name of a particular member in its complaint in order to survive a Rule 12(b)(1) motion to dismiss").[5]

*Building & Construction* remains good law. *Summers* couldn't have overruled it because *Summers* was an appeal from final judgment, 555 U.S. at 492, and *Building & Construction* already assumed that the rule might be different at later stages of litigation, 448 F.3d at 144-45. Conflating these two cases would ignore the rule that a plaintiff's burden to show standing changes "'at the successive stages of the litigation.'" *Id.* at 145 (quoting *Lujan*, 504 U.S. at 561). Other courts agree that *Summers* did not overrule their precedents holding that associations need not name members at the pleading stage. *E.g.*, *Am. Coll. of Emergency Physicians v. Blue Cross & Blue Shield of Ga.*, 833 F. App'x 235, 241 n.8 (11th Cir. 2020) ("[R]equiring specific names at the motion to dismiss stage is inappropriate."); *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015) (similar); *S.C. State Conf. of NAACP v. Alexander*, 2022 WL 453533, at *2-3 (D.S.C. Feb. 14) (Heytens, Gergel, Childs, JJ.) (similar).

The district court cited no persuasive authority to the contrary. Three of its cases were summary-judgment cases, not motion-to-dismiss cases. *See Assoc. Gen. Contractors of Am. v. Cal. Dep't of Transp.*, 713 F.3d 1187, 1194 (9th Cir. 2013); *Tenn. Republican Party v. SEC*, 863 F.3d 507, 517, 521 (6th Cir. 2017); *Ga. Republican Party v. SEC*, 888 F.3d 1198, 1201, 1204-05 (11th Cir. 2018) (petition evaluated under "'same'" standard as

---

[5] The same rule applies at the preliminary-injunction stage, at least before any discovery has occurred. *See, e.g.*, *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1119 (11th Cir. 2022).

summary judgment). One case questioned whether *Summers* requires associations to name members at the pleading stage, but the court ultimately declined to disturb its precedent allowing members "'to remain unnamed.'" *Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 2 F.4th 1002, 1011 (7th Cir. 2021) (quoting *Disability Rts. Wis., Inc. v. Walworth Cnty. Bd. of Sup'rs*, 522 F.3d 796, 802 (7th Cir. 2008)). And while the First Circuit once faulted an association for not naming a member in its complaint, this Court is not free to follow that case. The First Circuit thought a name was required because standing must be pleaded with "'heightened specificity.'" *Draper v. Healey*, 827 F.3d 1, 4 (1st Cir. 2016). This Court has held the opposite, both before and after *Summers*. *E.g.*, *Connecticut v. Am. Elec. Power Co.*, 582 F.3d 309, 333 (2d Cir. 2009) ("federal pleading rules do not require heightened pleading standards to allege standing" (citing *Bldg. & Constr.*, 448 F.3d at 145)), *aff'd in relevant part by an equally divided court*, 564 U.S. 410, 420 (2011).

The district court thought that, without names in the complaint, courts couldn't "'verif[y] the facts' upon which standing depends," JA107 (quoting *Summers*, 555 U.S. at 499); but that reasoning only highlights the court's failure to appreciate the procedural posture. Courts don't "verify facts" at the pleading stage; they accept the complaint's facts as true. *See Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 84 n.8 (2d Cir. 2015); *John*, 858 F.3d at 734; *Hu*, 927 F.3d at 88. After accepting the facts as true and drawing all inferences in the plaintiff's favor, courts ask whether the complaint "give[s] the defendant fair notice of what the claim is and the grounds upon which it rests."

*Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (cleaned up). A complaint can give fair notice without naming names; a defendant "need not know the identity of a particular member to understand and respond to an organization's claim of injury." *La Raza*, 800 F.3d at 1041. Indeed, the district court never explained how knowing the names of Members A and B—college students who are strangers to Pfizer—would have any effect on Pfizer's ability to draft an answer or a motion to dismiss. It plainly wouldn't, which is why this Court's decision in *Building & Construction* doesn't require it.

**2.** Even if *Summers* somehow overruled *Building & Construction*, Do No Harm satisfied *Summers* by naming specific members in its complaint. In every case cited by the district court—including *Summers* itself—the association lacked standing because it made statements about its membership *generally*; the problem was that the association failed to identify a *specific* member with standing. *See, e.g.*, *Summers*, 555 U.S. at 497 ("'thousands of members'"); *Prairie Rivers*, 2 F.4th at 1009 ("more than 1000 members"); *Draper*, 827 F.3d at 3 ("many of its members"). Do No Harm didn't do that. It identified two specific members and gave details about each of them to show how they are able and ready to apply to Pfizer's fellowship but don't qualify due to their race. *See* JA14-15 ¶¶49-69. The district court's sole basis for finding a violation of *Summers*, then, was that Do No Harm called its members "A" and "B" instead of using their real names.

Do No Harm is not aware of a single case holding that an association, despite identifying specific members with standing, violated *Summers* because it used pseudonyms. *Summers* doesn't say anything about pseudonyms. It couldn't have, since the

association there didn't identify any specific member—by pseudonym or otherwise. *See* 555 U.S. at 495. Though *Summers* said the association there had to "identify members," *id.* at 499, a member can be identified without using her real name, *see YAF v. Gates*, 560 F. Supp. 2d 39, 49 (D.D.C. 2008), *aff'd* 573 F.3d 797 (D.C. Cir. 2009). And though *Summers* used the words "name" and "naming" once in passing, pseudonyms are still a kind of name. And besides, *Summers* used those words merely as a synonym for "identify." 555 U.S. at 498. Judicial opinions cannot be "'parsed as though we were dealing with the language of a statute.'" *Brown v. Davenport*, 142 S.Ct. 1510, 1528 (2022) (cleaned up). It would "overread" *Summers* to think that it always "require[s] an organization to *name* the member who might have standing." *New York v. U.S. Dep't of Com.* ("*Census Case*"), 351 F. Supp. 3d 502, 606 n.48 (S.D.N.Y. 2019), *aff'd in part*, 139 S.Ct. 2551, 2565-66 (2019).

Not only does no case forbid the practice, but legion cases allow associations to sue on behalf of their anonymous members. Consider a few high-profile examples:

- In the DACA litigation, the district court let the NAACP assert associational standing at summary judgment on behalf of its members: DACA beneficiaries who submitted "anonymous affidavit[s]" and whose actual names were withheld from the government. *NAACP v. Trump*, 298 F. Supp. 3d 209, 225 & n.10 (D.D.C. 2018). The Supreme Court affirmed on the merits without questioning standing. *DHS v. Regents of the Univ. of Cal.*, 140 S.Ct. 1891, 1916 (2020).

- In *FAIR v. Rumsfeld*, an association of law schools that didn't want to host military recruiters (because of don't ask, don't tell) sued the Defense Department. The association's membership list was secret "to allay members' fears of retaliatory efforts on behalf of the government and private actors if the law schools were to participate as named

31

plaintiffs in a legal challenge." 291 F. Supp. 2d 269, 286 (D.N.J. 2003). The district court ruled that "FAIR need not reveal its membership list at the pleading stage" to prove standing. *Id.* at 287. Both the Third Circuit and the Supreme Court affirmed that ruling. *See* 390 F.3d 219, 228 n.7 (3d Cir. 2004) (independently reviewing and finding the association had standing); 547 U.S. 47, 52 n.2 (2006) (agreeing that "FAIR ha[d] standing").

- In a series of cases challenging affirmative action, Students for Fair Admission has sued on behalf of anonymous members. Every court held that SFFA proved associational standing at every stage of litigation. *See SFFA, Inc. v. Univ. of Tex. at Austin*, 37 F.4th 1078, 1086 (5th Cir. 2022); *SFFA, Inc. v. Pres. & Fellows of Harv. Coll.*, 980 F.3d 157, 184 (1st Cir. 2020); *SFFA, Inc v. Univ. of N.C.*, 2018 WL 4688388, at *6 (M.D.N.C. Sept. 29). Two of those cases are pending before the Supreme Court, on behalf of new anonymous members. *See* Pet'r's Rule 32.3 Ltr. at 1-2, *SFFA, Inc. v. Pres. & Harv. Coll.*, No. 20-1199 (U.S. May 2, 2022), perma.cc/5TJZ-XPCZ. Yet no party, lawyer, or Justice has questioned SFFA's standing based on its members' anonymity.

This practice makes sense because anonymity is not even a question of Article III standing. The district court (but not Pfizer) relied on cases where "parties" didn't satisfy the requirements for anonymous litigation. JA108 (citing *Publicola v. Lomenzo*, 2022 WL 17256714, at *3-5 (2d Cir. Nov. 29), and *Sealed Plaintiff v. Sealed Defendant #1*, 537 F.3d 185, 189 (2d Cir. 2008)). But those requirements don't come from Article III; they come from Rule 10(a), which requires complaints to "name all the parties." Fed. R. Civ. P. 10(a); *see Publicola*, 2022 WL 17256714, at *3-5; *Sealed Plaintiff*, 537 F.3d at 189.

Pfizer did not argue that Do No Harm violated Rule 10(a), and no such argument could prevail. The only "parties" to this litigation are Do No Harm and Pfizer, both of which are named in the complaint. *See* JA9. Unlike the association itself, the *members* of an association are "not … parties to the litigation." *NAACP v. Ala. ex rel. Patterson*, 357

U.S. 449, 459 (1959). And the First Amendment protects the right to anonymously associate and litigate, so the law cannot force associations to unmask their members (and risk reprisals from defendants and private actors) without overcoming serious constitutional scrutiny. *See AFPF v. Bonta*, 141 S.Ct. 2373, 2382 (2021) (citing *Patterson*). "[T]o hold that Article III requires an organization to name those of its members who would have standing would be in tension with one of the fundamental purposes of the associational standing doctrine—namely, protecting individuals who might prefer to remain anonymous." *Census Case*, 351 F. Supp. 3d at 606 n.48 (citing *Patterson*, 357 U.S. at 458-60).

**3.** In all events, *Summers* does not hold that associations must always name their members, even at later stages of litigation. The district court "place[d] undue emphasis on language" from *Summers* and other cases "requiring plaintiff associations to 'identify' or 'name' members." *FAIR*, 291 F. Supp. 2d at 289. That language "goes not to a blanket rule that associations … must identify their membership, but rather to whether the factual allegations in a given context sufficiently demonstrate that an association indeed has members that have suffered an injury-in-fact." *Id. Summers* was simply an application of the general rule "that a plaintiff must prove 'facts sufficient to establish that one or more of its members has suffered, or is threatened with, an injury'"; and that rule can be satisfied in many cases "even as to those members whom [the plaintiff] does not identify by name." *Census Case*, 351 F. Supp. 3d at 606 n.48.

The association in *Summers* needed to identify a specific member because, otherwise, the Court couldn't be sure that any member with standing existed. The associations in *Summers* challenged regulations that allowed the Forest Service to undergo certain projects without first doing an environmental assessment. Their members were not directly affected by the challenged regulations, so their standing was "'substantially more difficult' to establish." 555 U.S. at 493 (quoting *Lujan*, 504 U.S. at 562). A member would have standing only if a forest project was imminent, the project would affect an area that the member imminently planned to visit, *and* the project threatened the member's ability to enjoy that area. *See id.* at 494. Yet the associations did not show that they had *any* member who satisfied these criteria. *See id.* at 497-98. They instead argued that, given the sheer size of their membership, it was a "statistical probability" that they had at least one member with standing. *Id.* at 497. The Court rejected this theory of "probabilistic standing." *Id.* at 499. Because the associations did not identify any specific members, the Court could not verify the key facts needed to show standing: it did not know whether any member "will *ever* visit one of the small parcels at issue." *Id.* at 500.

Do No Harm doesn't have that problem here. Members A and B are "'directly affected'" by Pfizer's discriminatory fellowship. *Id.* at 493. They are the victims of the discrimination, the white and Asian students who would apply but can't because of their race. Standing in this context is not "more difficult to establish"; it is "'ordinarily little question.'" *Lujan*, 504 U.S. at 562. And of course Members A and B exist. Do No Harm alleged that they exist (and added details about their readiness and ability to apply), *see*

JA14-15 ¶¶50-69; and this Court must take those allegations as true at this stage, *Fed. Defs. of N.Y., Inc. v. Fef. Bureau of Prisons*, 954 F.3d 118, 125 (2d Cir. 2020). That Do No Harm declined to disclose their identities in the complaint is "not evidence that the [association] *lacks* the alleged members—[it] merely suggest[s] the [association] has reservations about revealing those member names to Defendan[t]." *S.C. State Conf. of NAACP*, 2022 WL 453533, at *3. Whether Do No Harm must reveal them to Pfizer "is a discovery dispute" to be handled later, not a basis to dismiss the complaint. *Id.*

Tellingly, the district court couldn't explain how Member A and B's real names would change anything about Do No Harm's ability to show standing at the pleading stage. As explained in more detail below, Pfizer's race-based fellowship injures Do No Harm's members by preventing them from competing on an equal footing. *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007). That injury turns on their race, not their names. *See, e.g., id.* at 718-19 (assessing an association's standing to vindicate this injury even though its members' names were anonymous); *Census Case*, 351 F. Supp. 3d at 606 n.48 (assessing an association's standing to vindicate another injury because whether the anonymous members suffered that injury "depends on the facts …, not on his or her name"). Swapping the words "Member A" and "Member B" in the complaint for first and last names would serve "no" Article III "purpose." *La Raza*, 800 F.3d at 1041. Article III doesn't require it here.

### B. Do No Harm sufficiently alleged that Members A and B are able and ready to apply.

Do No Harm also alleged that Members A and B are able and ready to apply to the Breakthrough Fellowship, once Pfizer stops illegally using race. A plaintiff can challenge a discriminatory program even if he hasn't "'actually applied.'" *Gratz*, 539 U.S. at 260-62; *see Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 365 (1977) ("If an employer should announce his policy of discrimination by a sign reading 'Whites Only' on the hiring-office door, his victims would not be limited to the few who ignored the sign and subjected themselves to personal rebuffs."). If the program outright excludes him based on race, courts do not require him to go through the "futile gesture" of applying. *Teamsters*, 431 U.S. at 365. Even if the program just makes it more difficult for him to be accepted based on race, courts do not make plaintiffs apply and thus inflict the very injury they're trying to avoid—the inability to compete on an equal footing. *See Shea v. Kerry*, 796 F.3d 42, 50 (D.C. Cir. 2015); *SFFA (Texas)*, 37 F.4th at 1086. The plaintiff instead has standing if he alleges that he is "able and ready" to apply but the "discriminatory policy prevents [him] from doing so on an equal basis." *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 & n.5 (1993). Do No Harm sufficiently alleged both ability and readiness here.

**1.** Do No Harm sufficiently alleged that Members A and B are "able" to apply to the Breakthrough Fellowship, but currently can't on an equal footing because Pfizer excludes whites and Asians. The complaint alleges that fact explicitly. *See* JA13-15 ¶¶43-47, ¶57, ¶67. Though no more was needed, the complaint also alleges that A and B

"mee[t] all nonracial criteria" for the fellowship. JA14-15 ¶57, ¶67. Still more, the complaint walks through the nonracial criteria and alleges facts explaining why the members satisfy each one. *See* JA14-15 ¶51, ¶61 (junior); ¶52, ¶62 (citizen); ¶53, ¶63 (GPA); ¶54, ¶64 (leadership); ¶¶55-56, ¶¶65-66 (interest and intent).

In concluding otherwise, the district court failed to apply the pleading standard. It claimed that Do No Harm failed to show that Members A and B "meet the minimum Fellowship qualifications"—specifically, a "committed interest & intent to pursue an MBA" and "exceptional leadership potential." JA111-13. But at the pleading stage, the district court had to accept as true Do No Harm's allegation that Members A and B satisfy the fellowship's nonracial criteria. *Fed. Defs. of N.Y.*, 954 F.3d at 125; *see Revelis v. Napolitano*, 844 F. Supp. 2d 915, 923 (N.D. Ill. 2012). Do No Harm also pleaded that both members want to work for Pfizer, want to get an MBA, attend elite universities, and currently hold leadership positions. *See* JA14-15 ¶51, ¶¶55-56, ¶61, ¶¶65-66. Those allegations weren't "conclusory." JA113. But regardless, district courts cannot reject *facts* as conclusory, *Erickson*, 551 U.S. at 93-94, and they must assume general allegations include whatever specific facts are necessary, *Hu*, 927 F.3d at 89; *e.g.*, *Hassan v. Iowa*, 2012 WL 12974068, at *3 n.4 (S.D. Iowa Apr. 26), *aff'd*, 493 F. App'x 813 (8th Cir. 2012). And because no heightened pleading standard applies to standing, *Bldg. & Constr.*, 448 F.3d at 145, the district court erred by requiring Do No Harm to "allege with particularity" the qualifications of Members A and B, JA113-14; *see Hall v. City & Cnty. of San Francisco*, 2017 WL 5569829, at *6 (N.D. Cal. Nov. 20); *Christian Lab. Ass'n v. City*

*of Duluth*, 2021 WL 2783732, at \*9 & n.12 (D. Minn. July 2). The district court also failed

to construe the complaint and draw inferences in favor of Do No Harm, *John*, 858 F.3d

at 737, instead construing any silences in the complaint *against* it, *see* JA113-14.

More fundamentally, it doesn't matter if Pfizer or the district court believe that

Members A and B lack a "committed interest & intent to pursue an MBA" or "excep-

tional leadership potential." As the Supreme Court has repeatedly explained, "[t]he in-

jury in cases of this kind is that a 'discriminatory classification prevent[s] the plaintiff

from competing on an equal footing.'" *Adarand*, 515 U.S. at 211; *accord Jacksonville*, 508

U.S. at 666 ("denial of equal treatment resulting from the imposition of the barrier");

*Parents Involved*, 551 U.S. at 719 ("being forced to compete in a race-based system that

may prejudice the plaintiff"); *Gratz*, 539 U.S. at 262 ("opportunity to compete for ad-

mission on an equal basis"). Because the members' injury is their inability to compete,

they "need not allege that [they] would have obtained the benefit but for the [racial]

barrier in order to establish standing." *Jacksonville*, 508 U.S. at 666; *accord Adarand*, 515

U.S. at 211; *Gratz*, 539 U.S. at 262. Courts in these cases simply "do not inquire into the

plaintiff's qualifications (or lack thereof) when assessing standing." *Shea*, 796 F.3d at 50

(citing *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 280-81 & n.14 (1978).

The fuzziness of Pfizer's criteria illustrates why this approach is correct. Perhaps

the district court would have a point if Members A and B had GPAs lower than a 3.0

or had already graduated college—objective, discretion-less requirements that Pfizer

imposes on applicants. But whether an applicant has a "committed interest" in getting

a master's degree or has shown "exceptional leadership *potential*" are subjective criteria that will always be in the eye of the beholder. However a decisionmaker construes those criteria, Members A and B are injured because Pfizer's racial exclusion does not even let them "compete" to prove that they satisfy them. *Bakke*, 438 U.S. at 280-81 & n.14. If discriminators could always defeat standing by promising that they would have rejected the applicant anyway based on subjective, unfalsifiable grounds, they could always escape liability. Hence why that's not the law.

**2.** Do No Harm also sufficiently alleged that Members A and B are "ready" to apply, once Pfizer stops discriminating. Again, the complaint alleges that fact explicitly. JA14-15 ¶58, ¶68. And though no more was needed, more was pleaded. If their race was different, Members A and B would be the types of students Pfizer is looking for—student leaders at elite universities with great grades. *See* JA14-15 ¶51, ¶53, ¶61, ¶63. And Do No Harm alleged *why* Members A and B want to apply to the fellowship. *See* JA14-15 ¶¶55-56, ¶¶65-66. Their reasons shouldn't be surprising, since the fellowship is an incredibly lucrative program that guarantees multiple internships, a free master's degree, and a high-paying job at one of the largest companies in the world. *See* JA11-12 ¶¶32, 34-38. Members A and B also satisfy all the fellowship's nonracial criteria, JA14-15 ¶¶7, ¶67; were unable to apply before this year, JA14-15 ¶57, ¶67; and were just weeks away from the opening of the application window for the 2023 class, JA14 ¶48.

While Pfizer didn't meaningfully challenge Member A and B's intent to apply, the district court did based mostly on *Carney*—a decision from the Supreme Court that

39

Pfizer never cited. The district court read *Carney* as "reject[ing] the notion that a non-applicant's assertion that they are able and ready to apply is sufficient" to show standing. JA111-12. Yet the Court said the exact opposite: "We do not decide whether a statement of intent alone under other circumstances could be enough to show standing." 141 S.Ct. at 502. The Court went out of its way to say that its decision did not "depart from or modify … any" of its prior precedents in this area, *id.* at 503, and to stress that "[t]his is a highly fact-specific case," *id.* at 501. Specifically, the plaintiff in *Carney* lacked a real intent to apply because he could have applied 14 prior times but didn't; and he admitted that, after reading a law-review article suggesting that the policy was illegal, he abruptly changed his lifelong political affiliation and sued. *See id.* at 500-01. As the Court stressed over and over, it made this finding based on the "evidence" contained in "the particular *summary judgment* record before us." *Id.* at 503 (emphasis added); *accord, e.g.*, *id.* at 499 ("the record … at summary judgment"); *id.* at 500, 501 ("the summary judgment record"); *id.* at 501 ("the record evidence"); *id.* at 502 ("this particular record"); *id.* at 503 ("the context set forth by the evidence").

    *Carney* in no way suggests that Do No Harm's complaint is insufficient. Unlike *Carney*—a summary-judgment case that turned on the evidence—this case is at the pleading stage and turns on the complaint. Even if statements of intent were insufficient at summary judgment, *but see id.* at 502, they are sufficient at the pleading stage, where factual allegations are accepted as true and general allegations are read to contain the necessary specifics. *Hu*, 927 F.3d at 89; *see, e.g.*, *Christian Lab.*, 2021 WL 2783732, at *9

& n.12 (distinguishing *Carney* on this ground); *Hassan*, 2012 WL 12974068, at *3 ("general allegations as to 'readiness'" are sufficient at pleading stage); *Staco Elec. Constr. Co. v. City of Kansas City*, 2021 WL 918764, at *9 & n.9 (W.D. Mo. Mar. 10) (similar). Because "'intent … and other condition of mind may be averred generally,'" requiring plaintiffs to "plead other facts in addition to and in support" of that allegation would "amoun[t] to a heightened pleading standard." *Phelps v. Kapnolas*, 308 F.3d 180, 186 (2d Cir. 2002) (quoting Fed. R. Civ. P. 9(b)). Regardless, Do No Harm alleged more than just statements of intent, as explained above. And "nothing in th[e] Complaint"—the only place the court could look at this stage—suggests that Member A and B's intentions are insincere. *Revelis*, 844 F. Supp. 2d at 923.

The district court's attempts to shoehorn this case into *Carney* do not work. The plaintiff in *Carney* "did not apply" to the same position 14 times. 141 S.Ct. at 500. The plaintiffs here could not apply to the fellowship in 2021 or 2022 because applicants aren't eligible except the one year when they're a junior. JA12 ¶42. And unlike *Carney*, where the Court relied on evidence proving the plaintiff's disinterest, the district court here *assumed* disinterest based on a *lack* of allegations that Members A and B had pursued similar interests or fellowships in the past, *see* JA114—something it could not do at the pleading stage, *John*, 858 F.3d at 737. Especially since Pfizer itself admits that the fellowship is "first-of-its-kind." JA12 ¶39.

Nor does the complaint contain anything like the evidence of insincerity in *Carney*, where the plaintiff abruptly changed his lifelong party registration after admitting

41

he read a law-review article that gave him the idea to sue. 141 S.Ct. at 500. The district court faulted Members A and B for joining a "newly created organization," supporting "its mission," and supporting "this lawsuit." JA114. That reasoning turns associational standing on its head. "[T]he doctrine of associational standing recognizes that the primary reason people join an organization is often to create an effective vehicle for vindicating interests that they share with others." *UAW v. Brock*, 477 U.S. 274, 290 (1986). That this case has the hallmarks of associational standing cannot be a reason why Do No Harm lacks associational standing.

### C.    Associations like Do No Harm can sue on behalf of their members under §1981.

The district court broke new ground by holding that associations can never sue on behalf of their members under §1981. Instead of explaining why that rule follows from the text of §1981, the district court said it was bound to reach that result based on circuit precedent (that Pfizer never cited). It was mistaken.

True, this circuit (but no others) has a rule that bars associational standing under §198**3**. The rule traces back to *Aguayo*, a case from 1973 that predates the Supreme Court's recognition of associational standing in *Warth* (1975) and *Hunt* (1977). *Aguayo* stated that neither the "language" nor the "history" of §1983 suggested that "an organization may sue under the Civil Rights Act for the violation of rights of members." 473 F.2d at 1099. Despite "'a raft of Supreme Court precedent'" letting associations sue

under §1983, this Court has felt "bound" to continue following *Aguayo* under the prior-panel-precedent rule. *Nnebe v. Daus*, 644 F.3d 147, 156 & n.5 (2d Cir. 2011).

But even if *Aguayo* bars associational standing under §1983, it does not bar associational standing under §198**1**. According to *Aguayo*, its analysis turned on the specific "language" and "history" of §1983. 473 F.2d at 1099. In fact, the *Aguayo* court "agree[d]" that associations could sue on behalf of their members under other federal statutes. *Id.* (citing 28 U.S.C. §1331 and §1361). Section 1981 is one such statute. Unlike §1983, which was enacted as part of the Civil Rights Act of 1871, §1981 was enacted as part of the Civil Rights Act of 1866. The two statutes have different scopes and histories: While §1983 enforces the Fourteenth Amendment and creates a cause of action against state actors who interfere with federal rights generally, the relevant part of §1981 enforces the Thirteenth Amendment by preventing racial discrimination in contracting by private actors. *Runyon v. McCrary*, 427 U.S. 160, 170 (1976). The statutes also have different texts. This Court has long held that §1981's broad language—"[a]ll persons within the jurisdiction of the United States"—allows not just natural persons to sue, but also corporations. *Hudson Valley Freedom Theater, Inc. v. Heimbach*, 671 F.2d 702, 706 (2d Cir. 1982); *see also Simmons v. UBS Fin. Servs., Inc.*, 972 F.3d 664, 671 (5th Cir. 2020) (explaining that §1981's "expansive" text creates a wider class of potential plaintiffs than other statutes).

The district court nonetheless applied *Aguayo* to §1981 based on this Court's decision in *Warth*. There, associations sued a town over its zoning laws. 495 F.2d at 1189-

43

90. Using reasoning that the Supreme Court later rejected in the same case, this Court held that associational standing is appropriate only in "special circumstances." *Id.* at 1194-95; *but see* 422 U.S. at 511 (approving associational standing with no such limitation). This Court, citing *Aguayo*, also said, "It is highly doubtful that an organization has standing to represent its members in most cases under the Civil Rights Act." 495 F.2d at 1194 (citing 473 F.2d at 1098-101). The district court read this sentence from *Warth* as a holding that associations can never sue under §1981, and it thought that holding was reaffirmed by this Court in a case from 1984. JA116-17 (citing *League of Women Voters*, 737 F.2d at 160-61). Pfizer did not make this argument about circuit precedent below, or even cite this Court's decision in *Warth*. *See* D.Ct. Doc. 30 at 21-22.

Had Pfizer made the argument, Do No Harm would have stressed the difference between §1981 claims against state actors versus private actors. When plaintiffs sue private actors for violating §1981, their cause of action is an implied right of action that the Supreme Court created in 1975. *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S.Ct. 1009, 1015 (2020) (citing *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 459 (1975)). But when plaintiffs sue state actors for violating §1981, their sole cause of action is §1983. "Section 1983 'constitutes the exclusive federal remedy for violation of the rights guaranteed in §1981 by state governmental units.'" *Williams v. N.Y.C. Hous. Auth.*, 2023 WL 2171483, at *8 (2d Cir. Feb. 23); *see Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 733 (1989). In other words, *Aguayo*'s ban on associational standing under §1983 was implicated in *Warth* because that case *was* a §1983 case. *See Warth*, 495 F.2d

44

at 1189. Hence why this Court addressed the associations' standing "under the Civil Rights *Act*" singular, meaning the Civil Rights Act of 1871 where §1983 appears. *Id.* at 1194 (emphasis added). And hence why this Court has only ever cited *Warth* as denying associational standing *under §1983*—not under §1981. *See League of Women Voters*, 737 F.2d at 160-61. Because Do No Harm sued a private company, this case arises under an implied right of action and 28 U.S.C. §1331, which *Aguayo* itself says permits associational standing. *See* 473 F.2d at 1099.

Even if the question were one of first impression, this Court should not extend *Aguayo* to §1981. While courts must follow a binding precedent even when it's wrong, courts needn't extend wrong precedents to new statutes. *See Negusie v. Holder*, 555 U.S. 511, 520 (2009) (a decision "address[ing] a different statute … does not control"); *accord Kluchnik v. Lehigh Valley Coal Co.*, 228 F. 880, 882 (2d Cir. 1915); *United States v. Hardin*, 998 F.3d 582, 590 (4th Cir. 2021); *Klocke v. Watson*, 936 F.3d 240, 248 (5th Cir. 2019). For example, the Supreme Court has repudiated its line of precedents liberally recognizing implied private rights of action. *See Alexander v. Sandoval*, 532 U.S. 275, 287 (2001). While its past precedents recognizing an implied action "remai[n]" good law for the statutes they interpreted, the Court will not "exten[d]" them. *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 165 (2008). It will not use them to justify recognizing an implied right of action in a new statute—or even in a new provision of the "same" statute where it previously recognized an implied right. *Sandoval*, 532 U.S. at 287; *see, e.g.*, *Olmsted v. Pruco Life Ins. Co. of N.J.*, 283 F.3d 429, 434 (2d Cir. 2002).

This Court should likewise refuse "one last drink" from *Aguayo* by unnecessarily extending it to §1981. *Sandoval*, 532 U.S. at 287. *Aguayo* is plainly incorrect. It admits that associational standing is okay under other statutes but insists that §1983 is different without explaining why. *See* 473 F.2d at 1099-100. No textual or historical reason exists. Indeed, every other federal appellate court in the country lets associations sue on behalf of their members under §1983. *See Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 123 (2d Cir. 2017) (Jacobs, J., dissenting). So does the Supreme Court, including in some of its biggest, most fiercely litigated cases. *E.g.*, *Jacksonville*, 508 U.S. at 659; *Parents Involved*, 551 U.S. at 718-19; *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 269 (2015). Pfizer might dismiss some of these decisions as "driveby" approvals of associational standing under §1983. But when so many skilled jurists and motivated advocates drive by an issue so many times, it's probably because the issue doesn't really exist.

Though *Aguayo* contains no clear reasoning, this Court has read it to rest on the assumption that §1983 is unique because "the rights it secures" are "personal," *League of Women Voters*, 737 F.2d at 160; but that reasoning is no better. Section 1983 does not secure "any substantive rights at all"; it is a "cause of action" for violations of *other* constitutional and statutory rights. *Chapman v. Houston Welfare Rts. Org.*, 441 U.S. 600, 617-18 (1979); *accord id.* at 617 ("one cannot go into court and claim a 'violation of §1983'—for §1983 by itself does not protect anyone against anything"). While those underlying rights are personal, the whole point of associational standing is that the

46

association is suing as a representative to assert the rights "of its members." *Hunt*, 432 U.S. at 342. The association can sue if one of its members could have sued, *id.* at 343, and no one doubts that individuals can sue under §1983. The *Aguayo* Court failed to appreciate how associational standing works, which isn't surprising since *Aguayo* pre-dates the Supreme Court's articulation of the associational-standing doctrine in *Warth* and *Hunt*. *See Huertas v. E. River Hous. Corp.*, 81 F.R.D. 641, 651-52 (S.D.N.Y. 1979) (explaining that *Aguayo* cannot be reconciled with *Warth* and *Hunt*); *Centro de la Comunidad Hispana*, 868 F.3d at 122-23 (Jacobs, J., dissenting) (noting that this Court has never tried to reconcile *Aguayo* with *Warth* and *Hunt*).[6]

In short, this Court should not bar associational standing under §1981, at least when the defendant is a private actor. Its precedents on §1983 do not, by their own terms, extend to §1981. And because those precedents are plainly wrong, this Court should not unnecessarily extend them to a new context. It would be absurd to say that the NAACP, for example, cannot assert associational standing under a statute that bans racial discrimination. *Contra NAACP v. Ameriquest Mortg. Co.*, 635 F. Supp. 2d 1096, 1101 (C.D. Cal. 2009). Nothing in text, history, or precedent supports that result.

---

[6] Stated another way, under the associational-standing doctrine, courts do not ask whether *the association* has statutory standing; they ask whether the association's *members* do. *See, e.g., Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 403 (1987) (trade associations could sue because their "members" fell within the statute's zone of interests); *Memphis A. Philip Randolph Inst. v. Hargett*, 2 F.4th 548, 557 (6th Cir. 2021) (NAACP could sue under §1983 to vindicate a member's rights because "[t]here is no prudential standing bar when member-based organizations advocate for the rights of their members"). So the notion that associations cannot sue under §1983 because the rights it protects are "personal" is a non sequitur.

**III.    This Court should reinstate Do No Harm's state and local claims.**

In addition to its federal-law claims, Do No Harm alleged that Pfizer's discrimi-natory fellowship violates state and city law. JA21-31 ¶¶117-213. After dismissing Do No Harm's federal-law claims, the district court "decline[d] to exercise supplemental jurisdiction over [its] non-federal claims." JA134. So if this Court "revive[s]" one or more of the "federal claims" by vacating or reversing, it should "also reinstate [the] state-law claims." *Fountain v. Karim*, 838 F.3d 129, 138 (2d Cir. 2016); *accord Velez v. Levy*, 401 F.3d 75, 102 (2d Cir. 2005).

# CONCLUSION

This Court should vacate the dismissal of Do No Harm's complaint with respect to Title VI and the ACA, reverse the dismissal of Do No Harm's complaint with respect to §1981 and Article III standing, and remand for further proceedings.

Dated: March 10, 2023

Respectfully Submitted,

*/s/ Cameron T. Norris*
Thomas R. McCarthy
Cameron T. Norris
Frank H. Chang
C'Zar Bernstein
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Ste. 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
cam@consovoymccarthy.com
frank@consovoymccarthy.com
czar@consovoymccarthy.com

*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

This brief complies with Local Rule 32.1(a)(4)(A) because it contains 13,198 words, excluding the parts that can be excluded. This brief also complies with Rules 32(a)(5)-(6) because it has been prepared in a proportionally spaced face using Microsoft Word 2016 in 14-point Garamond font.

Dated: March 10, 2023                    */s/ Cameron T. Norris*

## CERTIFICATE OF SERVICE

I e-filed this brief with the Court, which will email everyone requiring notice.

Dated: March 10, 2023                    */s/ Cameron T. Norris*