23-15
*Do No Harm v. Pfizer*

WESLEY, *Circuit Judge*, concurring in part and concurring in the judgment:

The same day it filed this case, Do No Harm chose to seek an "extraordinary" remedy. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). It asked the district court to freeze Pfizer's Breakthrough Fellowship program—and reconfigure the Fellowship's selection process—through a preliminary injunction. Do No Harm did so knowing that it faced a demanding burden to prove its connection to the harm alleged, that it lacked a developed factual record, and that its members who claimed injury used pseudonyms. It also knew that none of its members had applied for the Fellowship in the first place.

I agree with the majority that Do No Harm lacks Article III standing. I fully endorse two important aspects of the majority's standing framework: (1) once it moved for a preliminary injunction, Do No Harm had to prove standing under a summary judgment standard, *see Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011); and (2) when Do No Harm failed to meet its heightened standing burden, the proper action was to dismiss the case.

But I part ways with the majority as to *why* Do No Harm lacks standing. In my view, Members A and B did not show an imminent injury from the Fellowship's selection process. As our precedents require, neither member provided sufficient evidence to show they were "ready" to apply to the

Fellowship.  That is the fundamental way that we analyze standing; it suffices to end this case.  The majority passes on that analysis, and instead holds that to check the standing box, an organizational plaintiff relying on injury to some of its members must *also* provide those members' actual names.  We have no basis to impose this new constitutional rule.

I concur in the judgment affirming dismissal, but I cannot concur in full because the majority pronounces an unfounded "real name" test for associational standing.  That is an unfortunate ruling for organizations everywhere.

I

When it comes to Article III cases and controversies, a person's name does not describe whether they have been injured.  Do No Harm's lawsuit contends that Pfizer's Fellowship discriminates on the basis of race, not on the basis of names.  We know that Member A is white, and Member B is Asian-American.  Both claim they will be injured by the Fellowship because of their race.  Their names bear not on standing.

The general rules for standing are well-established.  As an organization which seeks "associational" standing, Do No Harm must show that "its members would otherwise have standing to sue in their own right."  *Students for Fair Admissions, Inc. v. Pres. and Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) (quoting

*Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977)). "[S]tanding requires an injury in fact that must be concrete and particularized, as well as actual or imminent. It cannot be conjectural or hypothetical." *Carney v. Adams*, 592 U.S. 53, 60 (2020) (citation and quotation marks omitted). That injury must also be "fairly traceable to the challenged conduct of the defendant" and "likely to be redressed by a favorable judicial decision." *Students for Fair Admissions*, 600 U.S. at 199 (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)). In the oft-repeated three-part test for standing—injury, traceability, and redressability—the Supreme Court has not included an *additional* requirement that plaintiffs must provide their names.

Indeed, at the pleading stage, our Court lets organizations establish standing without providing the name of an injured member. *See Building & Construction Trades Council of Buffalo v. Downtown Dev., Inc.*, 448 F.3d 138, 144–45 (2d Cir. 2006) (rejecting the notion that an organization must "name names" in its complaint to obtain standing). We did suggest, however, that there might be "some validity" to a naming requirement "at the summary judgment stage." *Id.*

Now, at the preliminary injunction stage (which incorporates the summary judgment burden), the majority takes that dictum and imposes a bright-line rule: A plaintiff organization must provide the real name of at least one injured member

or the case will be dismissed for lack of jurisdiction. In my view, neither Supreme Court precedent invoked by the majority supports this result.

In *Summers v. Earth Island Institute*, 555 U.S. 488 (2009), an organizational plaintiff sought to challenge regulations concerning Sequoia National Forest. The issue was whether a single member of the organization would visit that national forest and thus incur injury from the regulations. No member had come forward; the organization instead maintained that it was statistically likely that *some* of its 700,000 members would be injured. *See id.* at 497. In rejecting that argument, the Supreme Court used the words "name" and "identify" interchangeably—to observe that the case didn't involve *any* individual members of the organization. *Id.* at 498–99. *Summers* wasn't concerned with the members' names because those names wouldn't indicate whether the members would visit Sequoia National Forest and incur an injury. A person's name says nothing about their interests, their habits, or their conduct from which a court could conclude the individual will incur an injury from the defendant's act. Instead, by suggesting that the organization "name" its members, the *Summers* Court wanted to confirm that individual injured members *existed* in the first place.

Unlike in *Summers*, Do No Harm does not rely on statistical probabilities about its membership. It has identified individual members—Members A and B—

4

who claim they are able and ready to apply to Pfizer's Fellowship. The real first and last names of those members have no connection to whether they could apply to the Fellowship and incur an injury.

The same injury principle from *Summers* animated its predecessor, *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215 (1990). Once again, *FW/PBS* didn't involve pseudonymous members of organizations. In fact, it didn't use the word "name" at all. Instead, the Supreme Court rejected an affidavit which failed to "identify" which individuals in the city had their business licenses revoked—*i.e.*, whether *any* of the individuals in the case had suffered an injury. *Id.* at 235.

In sum, these cases didn't require organizations to "name names" to establish their members' injuries. They simply echoed longstanding Article III concerns about identifying a particular person to ensure that at least one member of the plaintiff organization had an injury. Even the majority admits that these cases do "not directly address" whether names are necessary. Maj. Op. at 20. Despite one or two passing uses of the verb "name," the opinion in *Summers* cannot "be parsed as though we were dealing with the language of a statute," and we should expect a far clearer statement from the Supreme Court before imposing a naming rule ourselves. *Brown v. Davenport*, 596 U.S. 118, 120 (2022) (citation and brackets omitted). After all, the Supreme Court itself regularly allows

organizations to sue on behalf of unnamed members. *See, e.g., Students for Fair Admissions*, 600 U.S. at 200–01 (organization had standing "when it filed suit" where it "identified" individual harmed members but did not provide their real names). The Supreme Court's own practice speaks volumes: It has not read *Summers* to create a naming requirement; neither should we.

To be sure, at least one circuit seems to have plucked the word "name" from *Summers* to craft a naming requirement for injured members of organizations. *See Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016) (Souter, *J.*). But others have remained focused on identifying a member's injury (as *Summers* and *FW/PBS* did), not a member's name. *See Speech First, Inc. v. Shrum*, 92 F.4th 947, 948–52 (10th Cir. 2024) (concluding that organization had standing despite relying on injuries to "Student A, Student B, and Student C," and explaining why *Summers* did not require those students to provide their real names); *Advocates for Highway & Auto Safety v. FMCSA*, 41 F.4th 586, 594 & n.2 (D.C. Cir. 2022) (unnamed members submitted survey statements which supported their injuries, yet their lack of names was "no barrier to [organizational] standing on this record"). The Ninth Circuit, notwithstanding the majority's contention, has maintained similarly. *See Associated Gen. Contractors of Am., San Diego Chapter, Inc., v. California Dep't of Transp.*, 713 F.3d 1187, 1194–95 (9th Cir. 2013) ("*Caltrans*"). Just like in *Summers*,

6

*Caltrans* didn't hold that members needed to provide their real names—because *no* member had come forward. The organization had failed to identify "any specific members . . . who would be harmed by Caltrans' program." *Id.* at 1195. Even if there were any lingering doubt about the meaning of *Caltrans*, the Ninth Circuit subsequently explained why names don't bear on standing:

> Where it is relatively clear, rather than merely speculative, that one or more members have been or will be adversely affected by a defendant's action, and where the defendant need not know the identity of a particular member to understand and respond to an organization's claim of injury, we see no purpose to be served by requiring an organization to identify by name the member or members injured.

*Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1038 (9th Cir. 2015). We should reaffirm the same.

With precedent absent, the majority is left to say that a constitutional naming requirement "makes sense." Maj. Op. at 21–22. The majority assures us that names show that members "are not merely enabling the organization to lodge a hypothetical legal challenge." *Id.* No doubt, we need "a real controversy with real impact on real persons." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021) (citation omitted). Yet this rationale for names—to ensure that Members A and B are real individuals and not fictitious enablers of the organization—is belied by the record. Both members declared that they are real students and real members

of Do No Harm.  The organization's Executive Director confirmed the same in her

own declaration.  As the majority observes, for standing purposes, we must take

these statements *as true*.  *See Cacchillo*, 638 F.3d at 404.  In other words, we have

already accepted that Members A and B are real people.[1]

Along the same vein, the majority claims that real names are "relevant" to

standing because they show a real controversy.  Apparently, they show "members

are genuinely ready and able to apply" to the Fellowship and incur an injury.  Maj.

Op. at 22.  This ready-and-able showing, as discussed below, is indeed the proper

inquiry for standing.  But the majority doesn't hold that members' names are

merely "relevant" to this inquiry.  Instead, in the very next paragraph, it says

names are henceforth "an essential component" of a member's standing.  *Id.*

Notice the unexplained leap—from names being "relevant," to names being

"essential."  It is unclear why someone must *always* give their name to a court to

show they are genuine about applying to a program.  What's more, according to

the majority, names are essential not only in cases where members haven't yet

applied to a program (the supposed justification for the rule), but also in the

garden-variety of associational standing cases where members have *already* been

---

[1] In any event, we already have procedural rules to address these concerns.  An organization can face serious consequences, for example, if it goes to court with fake injuries to fake members.  *See* Fed. R. Civ. P. 11.

injured.  *Cf. NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958) (NAACP members were threatened with violence after opening an Alabama office to support desegregation; the First Amendment protected those members' right to associate without disclosing their names to authorities).  That rule will sweep broadly.

And the justification is particularly awkward here, because the majority says it *won't* decide whether Members A and B are genuine about applying to this Fellowship.  The majority suggests that if it did, it would hold that the members *are* ready and able to apply.  *See* Maj. Op. at 27 n.8.  Ironically, that holding would demonstrate why "naming names" is an empty gesture.  By implying that Do No Harm would have standing if its members had just told us their real names, the majority reveals that we didn't need those names for standing after all.

In fact, if members' real names implicated Article III jurisdiction, then it would "make sense" to require those names at the pleading stage, too.  But the majority doesn't purport to question our holding from *Building & Construction* that members can plead an injury without their real names.  One is left wondering why these concerns suddenly become important enough to justify the opposite rule at summary judgment.  Aside from a general observation that the burden of proof has increased, the majority never says.

The majority finally declares that a naming requirement will avoid "incongru[ity]" between plaintiff individuals and plaintiff organizations. Maj. Op. at 23. I agree with my colleagues that when an organization presses claims on behalf of its members, "at least one association member must have standing to sue in their own right." *Id.* at 13. Thus, an organization's claim to standing is the same as that of its members—as if those members were themselves party to the litigation. But when (and only when) the *organization* is the party, the majority sees fit to add a naming requirement to standing, as a "demonstration of the sincerity of the member's interest" in the litigation. *Id.* at 22.

Yet in the interest of avoiding incongruities, the majority creates one. Consider the following: Members A and B sue Pfizer individually—not as members of Do No Harm—and refuse to give their real names to the court. So long as they showed an injury, a court would dismiss the complaint on *pleading grounds*, not jurisdictional ones. *See* Fed. R. Civ. P. 10(a) (requiring the complaint to "name all the parties"); *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 188–89

(2d Cir. 2008) (setting forth a multi-factor test for an individual plaintiff to proceed under a pseudonym despite Rule 10).[2]

By failing to give their names, the members would have run afoul of Rule 10, not Article III.  Why, then, does Do No Harm instead run afoul of Article III, not Rule 10?  Do No Harm's standing is dependent upon, and congruent with, that of its members.  One would think the standing requirements we impose upon each should be the same.  Instead, our Circuit has transformed a procedural rule into a bedrock constitutional obstacle.

What will be the upshot of this new rule?  Adding a naming element to standing—to ensure that members are "sincere" in their claims of injury—will constrict access to the courts for organizations who seek redress of wrongs done

---

[2] We impose Rule 10 (and related rules of procedure) for a myriad of practical reasons, not to determine whether someone has an Article III injury.  We have explained that Rule 10 "facilitates public scrutiny of judicial proceedings and the public's right to know who is using their courts.  It also serves to ensure that a readily identifiable attorney or party takes responsibility for every paper, thus enabling the Court to exercise its authority to sanction attorneys and parties who file papers that contain misleading or frivolous assertions.  Moreover, the Court cannot fulfill its statutory obligations to check for conflicts of interest or to give preclusive effect to state-court judgments in suits between the same parties without knowing the true identity of the parties at the outset of a case."  *Publicola v. Lomenzo*, 54 F.4th 108, 112 (2d Cir. 2022) (cleaned up).

None of this speaks to whether someone has incurred an injury to invoke our jurisdiction. Our naming rules focus on "matters of administrative convenience and efficiency, not on elements of a case or controversy within the meaning of the Constitution."  *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 556–57 (1996).

to those members.  Regardless of what organizations one joins or what causes one believes in, that is a troubling result.

II

That result becomes doubly troubling because it is doubly unnecessary.  We don't need to write a naming rule into the Constitution; in fact, we don't need a naming rule to resolve this case at all.  We could have determined standing the way we always have:  By analyzing the members' injuries themselves.

Members A and B did not prove they suffered actual or imminent injuries. Pseudonyms aside, the members offered precious little information about their lives and their future plans.  The only standing evidence they submitted were virtually identical declarations about their intentions to apply for Pfizer's Fellowship—a program to which they would dedicate at least five years of their lives.  Those declarations are not insufficient because they don't bear the members' real names.  They are insufficient because they are vague and conclusory.

When it comes to applying to discriminatory programs, the law allows a plaintiff to assert harm without formally applying.  The harm "is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993).

12

Pre-application standing, however, does not offer a blank check for anyone to challenge a discriminatory program they think violates the law. The plaintiff (or, in the organizational context, the plaintiff's members) must show they are "able and ready" to apply to the program. *Carney*, 592 U.S. at 60. That burden helps distinguish the plaintiff's grievance as something "more than an abstract and generalized harm to a citizen's interest in the proper application of the law." *Id.* at 59 (citation omitted).

In my view, Do No Harm has not met that burden. Most of the declarations' contents address the "ability" prong: The qualifications of Members A and B which make them eligible for the Fellowship. Those qualifications are pitched at a high level of generality. Both are Ivy League students (schools unknown), hold leadership positions (specifics unknown), and hold GPAs above 3.0 (majors, classes, extracurriculars, work history, etc., all unknown). But there will be many white and Asian-American juniors in the Ivy League—by my guess, thousands— who meet these same qualifications for the Fellowship. Once we set qualifications aside, the declarations have very little to offer on the "readiness" prong: The evidence that would truly distinguish Members A and B from the generalized Ivy League student population.

13

It is at this "readiness" prong that the declarations fall short. In total, I count five statements about readiness:

- "**I would like to apply** to the Pfizer Breakthrough Fellowship Program."

- "**I am interested in applying** to the Fellowship because it is a prestigious program. And **it seems like a great professional development opportunity**. I would benefit greatly from working in Pfizer's New York City office next summer and making professional connections and finding mentors through this Fellowship."

- "**I am also drawn by the fact that Pfizer will pay a full scholarship** for an MBA program. A fully funded MBA program would be a wonderful way to enrich my professional experience."

- "**I am able and ready to apply** to the 2023 class of the Fellowship if Pfizer stops categorically excluding white [or Asian-American] applicants like me from the Fellowship."

- "If I get accepted and join the Fellowship, **I am prepared to meet the program's requirements** and expectations."

Joint App'x at 36–41 (emphases added).

Even read liberally, these are a "few words of general intent" which do not suffice to prove readiness. *Carney*, 592 U.S. at 64. Our essential guidance regarding such statements comes from *Carney*, a case, like this one, involving a summary judgment burden to prove standing. There, a lawyer sought to challenge the constitutionality of judicial positions to which he had not applied. He nevertheless argued that he was ready to apply because he swore that he

"would apply for any judicial position that [he] thought [he] was qualified for," and "would seriously consider and apply for any judicial position for which he feels qualified." *Id.* at 61. The Supreme Court concluded that these statements were too generalized to prove standing—they had not "differentiated" the lawyer "from a general population of individuals affected in the abstract" by the constitutional provision. *Id.* at 64.

Those statements in *Carney* (that the lawyer "would apply" and "would seriously consider and apply") are effectively indistinguishable from the statements here (that Members A and B "would like to apply" and are "interested in applying"). And when the members say they are "able and ready to apply," they simply "parrot" the legal standard. *Calcano v. Swarovski N. Am. Ltd.*, 36 F.4th 68, 76 (2d Cir. 2022) (dismissing for lack of standing based on conclusory statements of intent). If those conclusory statements of intent alone were enough to show standing, then thousands of students could claim injury in this case—just so long as they sign a short declaration saying they are interested in Pfizer's Fellowship.

True, *Carney* did not decide for all time "whether [] statement[s] of intent alone . . . could" ever "be enough to show standing." 592 U.S. at 64. But it put a thumb on the scale against them. It required some additional evidence to support

the plaintiff's intent beyond his own statements—and identified several examples. For one, he had never applied to a similar position before. *Id.* at 61. Nor had he identified "an anticipated timeframe" for applying, any "prior relevant conversations," any "efforts to determine likely openings," any "other preparations or investigations," or plainly, "any other supporting evidence." *Id.* at 63.

What bolstering evidence have Members A and B put forth that would be similar to *Carney*'s examples? They have referenced an anticipated timeframe in that they had to apply during the Fellowship's 2023 cycle. But that's it. There is no "other supporting evidence" accompanying their words of general intent.

*Carney* therefore cuts decisively against Do No Harm. The Supreme Court's other "ready and able" cases are of no help either. They relied upon each plaintiff's history of previous applications to recurring programs to bolster standing. *See Gratz v. Bollinger*, 539 U.S. 244, 261–62 (2003); *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 211–12 (1995); *Ne. Fla. Chapter of Associated Gen. Contractors*, 508 U.S. at 668–69. Members A and B, of course, cannot rely on these cases or similar historical evidence—they can only apply to Pfizer's Fellowship once, during their junior year. Yet just because these cases are distinguishable does not mean we

should invert their holdings to *excuse* plaintiffs from providing some evidence besides historical applications when their own programs do not recur.

In *Carney*'s mold, our own precedents have required not just a stated intent to apply to a program, but some indicia of action—and crucially, have done so under a *lesser* burden at the pleading stage. For instance, we have held that members of an organization who alleged that they "intend[ed]" to apply for jobs at a university or "intend[ed]" to submit law review articles for publication failed to establish standing to challenge several of the university's allegedly discriminatory programs. *FASORP v. New York Univ.*, 11 F.4th 68, 76–77 (2d Cir. 2021). Those members described no "concrete plans" to actually apply; they just expressed "some day intentions" to apply. *Id.* at 77 (quoting *Summers*, 555 U.S. at 496). They had not identified anything they had done to apply for employment or submit an article (for example, by drafting an article for submission). *Id.* at 76. We have also held that a casino developer did not plead standing where it claimed to be "interested" in developing a casino and had even "made initial studies of the viability" of doing so, but had "not alleged any concrete plans to enter into a development agreement . . . or demonstrated any serious attempts at negotiation." *MGM Resorts Int'l Glob. Gaming Dev., LLC v. Malloy*, 861 F.3d 40, 47 (2d Cir. 2017).

This case is missing those same indicia of action. Members A and B described no concrete plans for applying to the Fellowship if it stopped discriminating against them tomorrow. Did they prepare any materials to submit to the Fellowship? Did they ask Pfizer for more specifics about the program, or talk to any Pfizer employees? Did they adjust their studies to strengthen their candidacies—perhaps by taking courses in biotechnology or business administration? Neither of them identified these or any other preparatory steps, big or small, to signal a concrete readiness to apply to the Fellowship—a life-changing program in which they would dedicate their careers to Pfizer for the next five years or more.[3]

Perspective is important here: On day one of this case, the plaintiff asked the district court to immediately alter a program, based solely on several members' claims that they "would like" to apply or were "interested" in applying to that program at some time in the future. In this context, to establish a case or controversy, these aspirational statements come up short.

---

[3] Like in *Carney*, these examples are not intended to be exhaustive. This is a "highly fact-specific" inquiry, and the record is not developed enough to determine every possible step that Members A and B could have taken to show they were ready to apply. *Carney*, 592 U.S. at 63. But we need not speculate about every piece of "supporting evidence" that the members could have provided. *Id.* The burden to do so was on Do No Harm.